**Harold WADO, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**Eugene HOSENFELD, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**John S. BERNHARD, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**Judith CARUANA, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**Robert GUSCIORA, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**George HAMANN, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**Pedro SANTIAGO, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**Patricia RAKE, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**Julie SCRIBNER, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**John B. SMITH, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**Dominick MAIORANO, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

**Phillip D. CUFARI, Plaintiff,**

v.

**XEROX CORPORATION, Defendant.**

A. George DNISTRIAN, Plaintiff,

v.

XEROX CORPORATION, Defendant.

Salvatore J. CATALANO, Plaintiff,

v.

XEROX CORPORATION, Defendant.

Edward LALIK, Jr., Plaintiff,

v.

XEROX CORPORATION, Defendant.

Nos. 95–CV–6096L through 95–CV–6101L, 95–CV–6103L through 95–CV–6106L, 95–CV6130L, 95–CV6176L, 95–CV–6189L, 95–CV–6190L and 95–CV–6331L.

United States District Court,
W.D. New York.

Jan. 16, 1998.

**182**

Theodore S. Kantor, Bilgore, Reich, Levine, Kroll & Kantor, Rochester, NY, for ·Judith Caruana, plaintiffs Harold Wado, Eugene Hosenfeld, John S. Bernhard, Judith Caruana, Robert H. Gusciora, George Hamann, Pedro Santiago, Patricia Rake, Julie Scribner, John B. Smith, Dominick J. Maiorano, Edward Lalik, Jr.

Donna Marianetti, Rochester, NY, for plaintiffs Philip D. Cufari, A. George Dnistrian, Salvatore Catalano.

Margaret A. Clemens, Eugene D. Ulterino, Nixon, Hargrave, Devans & Doyle LLP, Rochester, NY, for defendant Xerox Corp.

### DECISION AND ORDER

LARIMER, Chief Judge.

These fifteen cases arise out of the fifteen plaintiffs' terminations from employment by defendant Xerox Corporation ("Xerox") in 1994. Plaintiffs assert claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and certain other anti-discrimination laws. Xerox has moved for summary judgment, and it has also moved *in limine* to exclude the testimony of plaintiffs' expert, Philip A. Smethurst, Ph.D. Because these cases involve many of the same facts and legal issues, for purposes of these motions and this Decision and Order I am consolidating these cases pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, which permits consolidation "of any or all the matters in issue" in "actions involving a common question of law or fact . . . "

## FACTUAL BACKGROUND

In December 1993, Xerox announced that for financial reasons, it was going to implement a worldwide reduction in force ("RIF") beginning in 1994, which would reduce Xerox's 97,500–employee workforce by some 10,000 employees. Although plaintiffs dispute some of Xerox's assertions about the method by which Xerox determined which employees would be laid off, at least ostensibly each organization within Xerox would determine the number of employees within that organization that would be terminated, and the method of doing so.

In the divisions in which plaintiffs worked, employees were to be ranked by their managers in four areas: work quality, work speed, work orientation, and work skills. The scores were entered onto a form known as a Contribution Assessment Form ("CAF"). When this process was completed, the employees would be stack-ranked against each other, and in general, the lowest-ranking employees would be terminated.

According to defendant, Xerox put in place a number of safeguards to ensure that the RIF was carried out fairly and without disparately affecting any protected categories of employees. Xerox states that senior managers would review employees' contribution assessments for consistency and fairness, and that Xerox's legal department also conducted analyses of the termination recommendations to make sure that they would not have a discriminatory effect.

Plaintiffs deny most of these allegations. Plaintiffs allege that the RIF process was essentially a sham. They contend that their contribution assessment scores were deliberately manipulated by Xerox management in order to achieve Xerox's goal of terminating certain categories of employees, including older employees, for discriminatory and unlawful reasons.

## DISPARATE IMPACT CLAIMS

### 1. Disparate Impact Claims Under the ADEA

Twelve of the fifteen plaintiffs assert claims of age discrimination under theories of

both disparate treatment and disparate impact. Three female and two male plaintiffs also assert disparate impact claims of sex discrimination and "reverse" sex discrimination respectively. Defendant has moved for summary judgment on all the disparate impact claims, on several grounds.

■ First, defendant contends that the disparate impact ADEA claims must be dismissed because such claims are not cognizable under the ADEA. Xerox argues that the Supreme Court's decision in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), though not directly addressing this issue, by its reasoning implicitly calls into question the continued validity of prior Second Circuit case law holding that disparate impact claims may be brought under the ADEA.

An extensive analysis of the implications of *Hazen Paper* is unnecessary; however, because after Xerox filed its motion, the Second Circuit handed down its decision in *District Council 37, AFSCME v. New York City Dept. of Parks and Recreation*, 113 F.3d 347 (2d Cir.1997). In *District Council 37*, the court noted that "the Supreme Court has not decided whether a disparate impact claim could be made under the ADEA," *id.* at 351 (citing *Hazen Paper*, 507 U.S. at 610), but added that since the Second Circuit had recognized such an action in *Maresco v. Evans Chemetics*, 964 F.2d 106, 115 (2d Cir.1992), "despite the Parks Department's argument to the contrary, plaintiffs can make a disparate impact claim under the ADEA." *Id.*

The Second Circuit's holding in *District Council 37* clearly forecloses Xerox's argument in the case at bar. Therefore, I will proceed to consider the merits of plaintiffs' disparate impact ADEA claims.

## II. Requirements for Establishing a Disparate Impact Claim

■ A disparate impact claim is one that alleges a facially neutral policy that affects one class of employees more harshly than another and cannot be justified by business necessity. *Maresco*, 964 F.2d at 115. Proof of discriminatory intent is unnecessary. *See*

*Diehl v. Xerox Corp.*, 933 F.Supp. 1157, 1164 (W.D.N.Y.1996).

■ To establish a prima facie case of unlawful discrimination by showing disparate impact, each plaintiff "must first identify a specific employment practice having an adverse impact upon members of the protected class, i.e., 'that the practice excluded him or her, as a member of a protected group, from a job or promotion opportunity.'" *Maresco*, 964 F.2d at 115 (quoting *Waisome v. Port Auth. of New York and New Jersey*, 948 F.2d 1370, 1375 (2d Cir .1991)) (citations omitted). Statistical evidence may be used to establish a disparate impact claim, provided that it "reveals a disparity so great that it cannot be accounted for by chance ..." *Waisome*, 948 F.2d at 1375. In other words, "the statistical disparity must be sufficiently substantial to raise an inference of causation." *NAACP v. Town of East Haven*, 70 F.3d 219, 225 (2d Cir.1995).

■ If the plaintiff establishes a prima facie case, the employer then has the burden of coming forward with evidence to "show that the challenged practice had a legitimate purpose. If the employer meets this burden, the plaintiff must prove that the proffered purpose is pretextual." *District Council 37*, 113 F.3d at 352.

## III. Plaintiffs' Disparate Impact Claims

■ In support of their disparate impact claims, plaintiffs rely entirely upon statistical analysis reports prepared by their expert, Dr. Smethurst. He concludes that the RIF resulted in a statistically significant disparity between the percentages of employees who were laid off in the 40-and-over group and those who were laid off in the below-40 group (and between males and females, with respect to some of the sex discrimination claims).

Xerox has moved *in limine* under Rules 702 and 403 of the Federal Rules of Evidence to exclude Smethurst's testimony. Defendant contends that Smethurst's methodology is so flawed in several respects that it should be excluded under the principles enunciated by the Supreme Court in *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The Court in *Daubert* held that the Rules of Evidence require the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* 509 U.S. at 589. In particular, the Court noted, Rule 702 requires that "[t]he subject of an expert's testimony must be 'scientific ... knowledge,'" and that the expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 589–91. When faced with a proffer of expert scientific testimony, then, the Court stated, the trial judge must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. In addition, the Court observed that "in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to ... grant summary judgment," even if the evidence is deemed admissible. *Id.* at 596.

Defendant bases its challenge to Smethurst's findings and conclusions on several grounds. First, Xerox contends that Smethurst failed to take into account possible nondiscriminatory factors (such as job performance) that might have accounted for the allegedly higher likelihood of termination for employees in the relevant protected categories. Second, Xerox asserts that Smethurst based his statistical analysis on the wrong employee groupings. Xerox states that the correct method would have been to look at each plaintiff against the backdrop of the group of employees with whom that plaintiff was compared by Xerox for purposes of the RIF. Instead, Xerox states, Smethurst added or pooled data about other groups of employees to whom plaintiffs were not compared. Third, Xerox asserts that Smethurst's opinion is not probative of disparate impact discrimination because he failed to identify any specific employment practice that was allegedly responsible for any statistical disparity.

Having reviewed Smethurst's reports, I am not convinced of their admissibility. I agree with defendant that the reports are flawed in several significant respects, and that they are of little or no probative value. There is authority that would support exclusion of the reports for those reasons. *See, e.g., Raskin v. Wyatt Co.*, 125 F.3d 55, 67–68 (2d Cir.1997); *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997); *Martincic v. Urban Redevelopment Auth.*, 844 F.Supp. 1073, 1075–76 (W.D.Pa.), *aff'd,* 43 F.3d 1461 (3d Cir. 1994). I find it unnecessary to decide this issue, however, because even if Smethurst's testimony and reports were admissible, they would not suffice to create a triable issue of fact on plaintiffs' disparate impact claims.

First, it is true, and highly significant, that Smethurst failed to account for possible nondiscriminatory reasons for the disparities that he found. At his deposition, Smethurst was asked whether in his analysis he "control[led] at all for the different performance and skills ratings of the employees[.]" He responded:

No. The reason I didn't is that this performance and skills rating was the tool used by Xerox to determine whether the person was to be laid off or not.

In other words, Xerox managers were directed, I believe, to come out with a performance and skill rating and use that as a basis for determining who would be laid off or not. So I don't know how I would control for that performance and skill rating.

Smethurst Deposition ("Depo.") at 79. Smethurst was also asked what his conclusion would be if the employees' performance assessments were valid and accurate, but there was nevertheless a disparity between the over–40 and under 40–group. He stated that based on "[j]ust the difference in rates," he believed that would be evidence of age discrimination because he believed that it would be "extremely unlikely" for anything but past discriminatory treatment to have caused the two age groups to have such different skills

and performance levels. Smethurst Depo. at 95–96, 100.

As stated, however, the failure to account for possible nondiscriminatory reasons for statistical disparities can render an expert's opinion practically worthless. In *Raskin*, for example, the Second Circuit held that the district court did not err when, in granting summary judgment for the employer in an ADEA case, it disregarded the report of the plaintiff's expert, in part on the ground that the "report assume[d] that any anomalies in the ... data must be caused by age discrimination, and ma[de] no attempt to account for other possible causes." *Raskin*, 125 F.3d at 67–68 (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)). Because of this omission, the court said, the "report d[id] not serve to make it more or less likely that [the employer] engaged in any age discrimination ..." *Id.* at 68.

Similarly, in *Diehl*, Judge Telesca of this district held that the plaintiffs' expert's conclusion, based solely on statistical disparities, that the plaintiffs' dismissals and redeployments were likely caused by age and sex discrimination was "inadequate as a matter of law," in part because the expert "failed to conduct further statistical tests to determine what other factors could have accounted for those disparities." 933 F.Supp. 1157, 1167. Judge Telesca stated that "[w]ithout conducting any other statistical tests to rule out factors other than age or gender and by relying solely on age and gender ratios, [the expert's] testimony is fatally flawed pursuant to *Wards Cove*." *Id.* at 1168.

There is authority from other circuits in accord with this view. In *Sheehan*, 104 F.3d at 943, for example, the Seventh Circuit found "importune" the plaintiffs "expert's failure to correct for any potential explanatory variables other than age." *Id.* at 942. The court concluded that this failure was so serious that it rendered the expert's opinion inadmissible and "entitled to zero weight in considering whether to grant or deny summary judgment." *Id.* Likewise, in *Doan v. Seagate Technology, Inc.*, 82 F.3d 974 (10th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997), the Tenth Circuit reversed a verdict on a jury verdict for the plaintiff in an ADEA case, in part on the ground that evidence that a greater percentage of older workers was selected for a RIF while a greater percentage of younger workers was hired afterwards, standing alone, was insufficient to raise a jury question regarding the issue of pretext. The court found the plaintiff's statistical evidence flawed because it "failed to eliminate nondiscriminatory reasons for the numerical disparities.... Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext." *Id.* at 979.[1]

I also note that plaintiffs attempt to distinguish *Diehl* on the ground that Judge Telesca relied in part on the plaintiffs' expert's failure in that case to perform a regression analysis to take into account variables other than age. *See id.* at 1169. Plaintiffs state that after the *Diehl* decision was issued, Smethurst, in response to a request by plaintiffs' counsel, undertook a regression analysis in the three cases "wherein in [Smethurst's] judgment it may have been necessary." Plaintiffs' Joint Memorandum of Law at 20.

There are several problems in this regard, however. Aside from the fact that Smethurst did not perform regression analyses

---

1. In support of their argument that the only thing that matters is whether there is a correlation between plaintiffs' relatively low contribution assessment scores and their ages, plaintiffs, though citing no case law to that effect, do quote the following from the eighteenth-century philosopher David Hume:

> [W]e never can, by our utmost scrutiny, discover any thing but one event following another, without being able to comprehend any force or power by which the supposed cause operates, or any connexion between it and its supposed effect.

David Hume, Enquiries Concerning the Human Understanding and Concerning the Principles of Morals 73–74 (LA Selby–Bigge ed 2d ed 1902 Clarendon Press) (1977).

With apologies to Mr. Hume, who by his own account preferred to dwell in "the calm, tho' obscure, regions of philosophy," David Hume, The Natural History of Religion 95 (A. Wayne Colver ed., Clarendon Press 1976) (1757), the court would prefer to be guided in this case by the Federal Rules of Evidence, despite their relative paucity of literary quality and philosophical profundity.

on the other nine plaintiffs, about all that Smethurst concluded from his three regression analyses was that employees' performance assessments were "very closely related to the decision to lay somebody off." Smethurst Depo. at 401. What he generally found was that performing a regression analysis using the assessments as a variable yielded no statistically significant disparities, which he found unremarkable "because that was the thing that was used to lay people off." Smethurst Depo. at 404. These conclusions were fully consistent with his prior belief that regression analyses were pointless because, in his view, taking the performance assessments into account would in effect treat Xerox's discriminatory acts—i.e., its deliberately downgraded scores for older employees—as if they were independent variables, which he believed they were not. Smethurst Depo. at 445.

■ The reasons for Smethurst's belief that possible nondiscriminatory reasons, such as performance assessments, could not or should not be taken into account in these cases, however, points to a very fundamental flaw in plaintiffs' disparate impact claims: regardless of the label plaintiffs attach to their claims, they are at bottom disparate treatment claims only. In effect, what Smethurst stated at his deposition was that he did not take the performance assessments into account precisely because those assessments were the ostensible basis for plaintiffs' terminations. In other words, if the numerical ratings assigned to plaintiffs had been deliberately downgraded, they could not be taken into account for statistical purposes because they were themselves discriminatory, and did not reflect plaintiffs' actual performance levels.[2] If this were true, it would mean that plaintiffs' terminations were not the result of a facially neutral policy, but of intentional discrimination.

In two recent cases, *Renaldi v. Manufacturers & Traders Trust Co.*, 954 F.Supp. 614 (W.D.N.Y.1997), and *Hunt v. Tektronix, Inc.*,

952 F.Supp. 998 (W.D.N.Y.1997), this court has granted summary judgment for defendants on disparate impact claims that were based on allegations that the defendants had deliberately discriminated against the plaintiffs. The reasoning of those decisions applies here as well. Even if plaintiffs can show some statistical disparities between termination rates of workers age 40 and over and workers under 40, the gist of plaintiffs' factual allegations is that this disparity was the result of Xerox's conscious decision to terminate older employees. This is therefore not comparable to a case in which a company decides which employees to terminate based on a facially neutral criterion that, when actually applied as intended, tends to favor one group of persons over another. For example, an employer's policy of firing all employees who could not bench-press 100 pounds would likely favor male employees over females, without the need for the employer to resort to any subterfuge or deception in the implementation of the policy. In contrast, plaintiffs in the cases at bar claim that Xerox's pronouncements about the procedures for conducting the RIF were nothing more than a cover for behind-the-scenes, intentional discrimination. "It is clear, then, that plaintiff[s are] not alleging that application of a facially neutral policy had a disparate impact, but that [Xerox] deliberately singled out older employees for termination or transfer. That does not state a disparate-impact claim." *Renaldi*, 954 F.Supp. at 620. *See Maresco*, 964 F.2d at 115 (dismissing disparate impact claim because plaintiffs "facially neutral employment practice ... coalesces with the discharge which he claims to have constituted disparate treatment").

I recognize that a plaintiff may proceed under alternative theories of liability, but there still must be factual allegations to support both theories for both claims to survive a motion for summary judgment. Plaintiffs' allegations in the case at bar simply do not support a disparate impact claim.

---

**2.** Smethurst also opined that the ratings might be accurate, but nonetheless discriminatory in the sense that older employees as a group had somehow previously been caused to underperform compared to younger employees. Smethurst Depo. at 96–97. However, neither he nor

plaintiffs have identified any employment practice that could have caused such a disparate impact on older workers, and in fact plaintiffs allege that they all performed very well at their jobs. There is thus no basis for a disparate impact claim based on such a scenario.

## DISPARATE TREATMENT CLAIMS

### 1. Requirements for Establishing a Disparate Treatment Claim

The standards applicable to claims of disparate treatment under the ADEA and Title VII have long been well established. The analysis to be applied is that set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53 (quoting *McDonnell Douglas*, 411 U.S. at 802).

To establish a prima facie case of individualized disparate treatment under this analysis, a plaintiff must show: (1) membership in a protected class; (2) that the plaintiff satisfactorily performed the duties required by his position; and (3) that the plaintiff was subjected to some adverse job action; (4) under circumstances giving rise to an inference of discrimination. *See Viola v. Philips Medical Systems of North America*, 42 F.3d 712, 716 (2d Cir.1994); *Woroski v. Nashua Corp.*, 31 F.3d 105, 109 (2d Cir.1994). The plaintiffs burden to establish a prima facie case is *de minimis*. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

In the cases at bar, Xerox has proffered legitimate, nondiscriminatory reasons for plaintiffs' terminations: that all the plaintiffs were validly and accurately given relatively low performance assessment ratings that justified their terminations as part of the economically-justified RIF. In addressing each plaintiffs claims, then, I will assume that he or she has made out a prima facie case, and proceed to consider whether the plaintiff has presented sufficient evidence to create a triable issue of fact about whether Xerox's proffered reason is a pretext for discrimination. *See United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all it needs to decide whether 'the defendant intentionally discriminated against the plaintiff' ") (quoting *Burdine*, 450 U.S. at 253); *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 119 (2d Cir.1994).

## II. Individual Plaintiff's Claims

### A. John S. Bernhard

■ Plaintiff John S. Bernhard alleges that he was terminated on account of his age, in violation of the ADEA, the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991), and the New York State Human Rights Law ("HRL"), N.Y.Exec.L. § 296. Prior to his termination in January 1994 at the age of 55, Bernhard was employed as an engineer in Xerox's Document Production Systems ("DPS") department. In December 1993, Bernhard's manager, Brendan Casey, filled out a CAF for several employees who reported to him, including Bernhard. Although Casey initially wrote "11" (out of a possible 20) on Bernhard's form, he later crossed it out and gave Bernhard a 9. At his deposition, Casey testified that he wrote down the 11 because at the time, Bernhard's wife was on the staff of the Vice President/General Manager where Casey worked, and Casey was afraid that if he gave Bernhard a 9, Bernhard would be laid off, with possible adverse consequences for Casey's own career. He testified that Bernhard then moved to a different group, and that James Riley, one of plaintiffs managers in that group, called Casey and told him, "This isn't fair. We're going to lay off some people who performed better than John, and it isn't fair that these ratings are not consistent." Casey Depo. (Margaret A. Clemens Aff. Ex. E) at 24–25. Casey stated that after he had

"agonized over it a long time," he agreed out of fairness to change Bernhard's rating to a 9. Casey Depo. at 25. Xerox states, and Bernhard does not deny, that Bernhard's 9 rating was among the lowest in DPS, and he was notified of his termination on January 18, 1994, effective that day.

As evidence of disparate treatment, Bernhard alleges the following. First, he contends that the change in his rating from 11 to 9 shows that his score was manipulated to justify his termination. He also alleges that beginning around January 1993, he was moved three times to various jobs within Xerox, and that during his final year of employment he worked under six supervisors but was given little supervision. He alleges that this course of events was "a contrived set of circumstances designed to reduce [his] so-called contribution assessment score and thereby justify [his] lay-off." Bernhard Aff. ¶ 10(E). He states that in December 1993, his skill code was changed from System Engineer to Mechanical Engineer without his knowledge or consent, and that he had not had any mechanical engineering experience since 1982 and had no intention of moving into mechanical engineering. Bernhard also states that to his knowledge he was the second oldest employee in the group from which he was terminated, and that the only other employee terminated from that group was about 61 years old.

■ I find that, taken together, these allegations fail to create a genuine issue of fact about whether Xerox's proffered reason for Bernhard's termination is a pretext for age discrimination. First, the fact that he was initially given an 11 rating by Casey is not probative of anything other than the fact that Casey changed his mind about what score Bernhard deserved. There is no proof at all that Bernhard's age had anything to do with the change from an 11 to a 9. Plaintiff may believe that his 9 rating was unjustified, but an employee's personal disagreement with his employer's evaluation of him is not enough to create an inference of discrimination. "Dismissals are often preceded by adverse performance reviews. Were we to view this pattern as suspect, without more, many employees would be able to appeal their personnel evaluations to a jury." *Viola,* 42 F.3d at 718. *See also Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1039 (10th Cir.1993) (employee's own assessment of his job performance is inadequate to raise issue of fact for trial); *Billet v. CIGNA Corp.,* 940 F.2d 812, 825 (3d Cir.1991) ("The fact that an employee disagrees with an employer's evaluation of him does not prove pretext"); *Jimoh v. Ernst & Young,* 908 F.Supp. 220, 226 (S.D.N.Y.1995) (to prove discrimination claim, "plaintiff must do more than simply disagree with his employer's business decisions").

Likewise, there is no evidence to support Bernhard's assertion that his repeated reassignments during 1993 were "contrived" to lay the groundwork for his termination. At Bernhard's deposition, he conceded that these reassignments were necessitated by external events. For example, he stated that in January 1993, he was asked to transfer to a certain division "to head up a special project, because they couldn't get the subsystem to work." Bernhard Depo. at 32. He makes no allegation that Xerox's stated reason for this transfer was false, nor is there any indication that this transfer was designed to "set him up to fail" by sending him into a job he was not qualified for; in fact, plaintiff alleges in his affidavit that he "quickly accomplish[ed] his objectives" in the new position. Bernhard Aff. ¶ 10(B).

Similarly, Bernhard testified that in August 1993, the project that he had been working on "was winding down, and so we were told to look for jobs. And an opportunity came up" in another program, and he accepted an offer to work on that program. Bernhard Depo. at 34. He further stated that later that "program was canceled," so he was transferred to a different unit. *Id.* at 35. That program, too, was canceled, and Bernhard was terminated about a week later. *Id.* Nowhere is there any suggestion that the reasons for Bernhard's transfers were pretextual.

The change in Bernhard's skill code from systems to mechanical engineer likewise shows nothing. The apparent implication of this allegation is that this change was meant to put Bernhard into a position he would do

poorly at ·because of his lack of recent mechanical engineering experience, but the January 1993 reassignment was from a systems engineer position to the Mechanical Design Group, and as noted, Bernhard states that he performed that job quite effectively. He also testified that after completing that project, he *applied for* and received a position as a mechanical systems integration engineer in August 1993. Bernhard Depo. at 34. To read something sinister into his skill code change, then, would be completely irrational.

Plaintiff's allegation that he was the second-oldest person in his group, that the oldest employee was also terminated, and that Xerox retained younger, less experienced employees, in the absence of any other evidence of discrimination, is also insufficient to give rise to a genuine issue of fact for trial. "[P]laintiff s age, standing alone, is insufficient to satisfy his burden of proof." *Williams v. Brooklyn Union Gas Co.*, 819 F.Supp. 214, 225 (E.D.N.Y.1993). If it were, any employer who terminated one of the oldest employees in any particular unit could be forced to litigate an ADEA claim all the way to trial. *See Suttell v. Manufacturers Hanover Trust Co.*, 793 F.Supp. 70, 74 (S.D.N.Y.1992) (mere fact that younger, less-experienced employee assumed plaintiff's former duties after plaintiff was terminated in RIF was insufficient to give rise to inference of discrimination).

■ Aside from Bernhard's own allegations, the only evidence he offers in support of his claim is the statistical evidence by Dr. Smethurst. Although statistical evidence can be used to support a disparate treatment claim, *see Hollander v. American Cyanamid Co.*, 895 F.2d 80,84 (2d Cir.1990), I find that Smethurst's testimony and reports have no more probative value on Bernhard's disparate treatment claim than they do on his disparate impact claim, for the reasons already stated. The same is true as to the other plaintiffs, and I will not repeat those reasons in my discussion of every plaintiff. It should be pointed out, however, that Smethurst stated at his deposition that he did not do a statistical analysis of the group against which Bernhard was stack-ranked because that group of "40 or 50" employees was so

small that the fact that the two employees who were laid off in that group "would not be statistically significant." Smethurst Depo. at 133, 140. Instead, he analyzed a much larger group of 1253 employees, which means that about·1200 of those employees were *not* included in ·the stack-ranking for Bernhard's group. That analysis is not probative of whether Bernhard was discriminated against. *See Maddox v. Claytor*, 764 F.2d 1539, 1554–56 (11th Cir.1985) (district court did not err in concluding that plaintiffs failed to make out prima facie case of disparate impact based on statistical analysis that improperly lumped together different promotion opportunities); *cf. Raskin*, 125 F.3d at 67 (plaintiffs expert's method rendered "general population" group an unrepresentative sample for his comparison with defendant's employees, and expert's analysis was therefore not probative of age discrimination).

**B. Judith Caruana**

■ Plaintiff Judith Caruana alleges that she was terminated on account of her age and sex, in violation of the ADEA, Title VII, and the HRL. Prior to her termination in January 1994 at the age of 50, Caruana was employed as a quality specialist in Xerox's Convenience Copier Focus Factory ("CCFF") in the Corporate Strategic Services ("CSS") unit. In December 1993, Caruana's manager, Peter Cook, filled out plaintiff's CAF, giving·her a total score of 14 out of a possible 20. After a group of managers reviewed Caruana's and other employees' CAFs, Caruana's score was lowered to 12. Out of the forty employees in Caruana's skill group against whom she was ranked, the bottom ten, including Caruana, were terminated.

Plaintiff alleges the following in support of her claims. She alleges that after she received a sum of funds from the settlement of a lawsuit arising out of the death of her daughter, Cook began asking her why she did not retire, since she no longer needed to work for a living. Caruana also states that in the Summer of 1993, she received her first negative performance review, which stated that she had not performed up to her previous standards because she had been on sick

leave for five weeks in the spring. She claims that this negative review was a form of retaliation against her for not having retired voluntarily. Caruana also states that in the latter part of 1993, Cook began removing some of her job functions from her so that she would appear to be performing poorly. She claims that at the time of her termination, she was told both by a friend and by "someone" in the personnel department that she and other women who were being terminated were "sacrificial lambs" to balance the number of men who were being terminated. Lastly, she alleges that after her termination, Xerox hired two younger persons to perform her former duties.

None of these allegations gives rise to a genuine issue of material fact regarding either of Caruana's claims. The alleged statements by a friend of Caruana and by "someone" in the personnel department about women being "sacrificial lambs" are rank hearsay, and one of the speakers is not even identified. A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985) (citations omitted). Caruana has made no such showing here.[3]

Caruana's age discrimination claim fares no better. Cook's alleged questions about why Caruana did not retire after she received her settlement funds is insufficient to show pretext for several reasons. First, it is at best barely probative of discriminatory animus. That someone who receives a very large enough sum of money[4] should be asked by a coworker why she does not retire hardly seems remarkable, since many workers would probably retire early if they could afford it. Furthermore, Caruana herself, when asked at her deposition whether anyone at Xerox ever spoke to her about voluntarily retiring, responded, "No. It was just one of those jokes that Pete used to come up with that said with all the money I've got I should retire." Caruana Depo. (Defendant's Motion for Summary Judgment Ex. E) at 184.

Beyond that, however, this evidence suffers from the same problem as the rape allegation: Cook was not the one who gave Caruana a score of 12, nor were these remarks, which were allegedly made in the Spring of 1993, in any way related to the

---

3. Caruana also alleges in her affidavit in opposition to defendant's motion that Cook raped her during a business trip on an unspecified date. Caruana did not make this allegation in her administrative complaint with the Equal Employment Opportunity Commission ("EEOC"), however, or in her complaint in this action, so she is barred from basing a claim on this allegation in this action. *See Stewart v. United States I.N.S.*, 762 F.2d 193, 198 (2d Cir.1985); *Donahue v. Pendleton Woolen Mills, Inc.*, 719 F.Supp. 149 (S.D.N.Y.1988).

 Even if this allegation were considered as evidence, it does not support Caruana's claim. For one thing, Cook was not the ultimate decisionmaker with respect to Caruana's termination; he gave her a score of 14 on her CAF, which was lowered to 12 by other managers. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (statements or actions by nondecisionmakers, or actions unrelated to decisionmaking process, cannot support allegation of pretext) (O'Connor, J., concurring); *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 97 (1st Cir.1996); *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir. 1991); *Nawrocki v. Daeman College*, No. 95–CV–0618E (SC), 1997 WL 211338 *3 (W.D.N.Y. Apr.25, 1997). There is also no basis on which

to impute any knowledge of this incident to the managers who decided to terminate Caruana, since Caruana stated at her deposition that she had never "told a soul" about the alleged rape. Caruana Depo. (Clemens Aff. Ex. A) at 17 1. *See Murray v. New York Univ. College Of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995); *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir.), *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994).

 In addition, if Caruana is claiming that Cook took some actions against her after the alleged rape, or wanted her out of Xerox, in order somehow to cover up the rape, that does not amount to sex discrimination. Covering up a crime by trying to engineer the victim's termination is not actionable under Title VII. *See Ellert v. University of Texas, at Dallas*, 52 F.3d 543, 546 (5th Cir. 1995) (even if plaintiff's knowledge of dean's illicit relationship with female assistant was the true animus behind dean's decision to discharge her, "it was a motivation that did not rely upon her gender and, as such, it was not within the ambit of Title VII's protections").

4. The amount of the settlement money does not appear in the record, but it was presumably not insubstantial, given Cook's alleged comments.

decisionmaking process with respect to the RIF in January 1994. *See Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 674 (8th Cir.1995) (no link between supervisor's reference to plaintiff as "the old man" and plaintiff's termination); *Kriss v. Sprint Communications Co., Ltd. Partnership*, 58 F.3d 1276, 1281–82 (8th Cir.1995) (supervisor's rude comments about certain female employees, including calling one of them a "bitch," were little more than statements by decisionmakers unrelated to the decisional process); *Nawrocki*, 1997 WL 211338 *3 (supervisor's references to plaintiff as a "Polack" "were not temporally proximate to the discharge and were unrelated to the decisional process itself," and hence did not support claim of discriminatory discharge).

There is also no evidence to support plaintiff's allegation that her unfavorable performance review in the Summer of 1993 was in retaliation for her refusal to retire. As stated before, an employee's subjective belief that her employer's assessment of her is unjustified is insufficient to give rise to an inference of discrimination. *Viola*, 42 F.3d at 718; *Shapolia*, 992 F.2d at 1039. Cook's "jokes" about Caruana retiring, and Caruana's belief that the unfavorable review was unjustified, do not add up to enough to support plaintiffs allegation of retaliation.

Caruana's allegation that Cook began removing some of her duties from her in the Fall of 1993 similarly fails to support an inference of pretext. Plaintiff has not explained how that action was causally related to the decision to terminate her, or how it contributed to her score of 12 on the CAF. Moreover, when asked at her deposition whether she had any reason to believe that Cook's desire to shift some of Caruana's duties elsewhere "was due to either [her] age or gender," Caruana replied, "No." Caruana Depo. (Defendant's Motion for Summary Judgment Ex. E) at 186.

 The allegation that after Caruana's termination, Xerox hired two people in their early twenties to assume Caruana's former duties is also insufficient to defeat Xerox's motion. First, the only basis for this allegation is the fact that after her termination, Caruana met two men she used to work with, both of whom still worked at Xerox. They allegedly told Caruana that "they were both training people that were to take [Caruana's] place, take [her] responsibilities," and that the trainees were new hires. Caruana Depo. at 42, 50. Caruana admitted, however, that she had no firsthand knowledge of whether that was true. *Id.* at 50. This evidence, too, then, is pure hearsay and cannot be considered on this motion. Furthermore, with no evidence of the circumstances of these alleged replacements' hiring, their qualifications, or the full range of their duties, this unsubstantiated allegation is simply not enough to indicate that Caruana was terminated because of her age. *See In re Western Dist. Xerox Litigation*, 850 F.Supp. 1079, 1089 (W.D.N.Y.1994) ("It is difficult to imagine a corporation this large never having to hire new employees in some areas, even during an overall reduction in force").

As already stated, I find that Caruana's statistical evidence is also not probative of discrimination. I also note, however, that Smethurst stated at his deposition that the CCFF group from which she was terminated was too small to "enable you to draw a statistical conclusion." Smethurst Depo. at 219. He also agreed, however, that if a statistical analysis were performed on that group, there was no statistical significance between the rates of termination of the 40–and–over group and the under–40 group. *Id.* at 220. In addition, Caruana was one of the three plaintiffs with respect to whom Smethurst performed a regression analysis, and concerning that test, he was asked at his deposition, "So basically, the bottom line is you found no statistical evidence of gender discrimination in Ms. Caruana's case?," to which he responded, "Right." *Id.* at 504.

 Caruana's complaint also alleges that Xerox discriminated against her on the basis of her sex by "consistently giving preference to male candidates for promotion and/or hiring solely on the basis of gender." Complaint 132. Caruana stated at her deposition that the basis for this claim was that she was passed over for promotion in 1987 and 1989. Caruana Depo. at 197. Those events, however, occurred more than 300 days prior to Caruana's filing her EEOC

charge on September 21, 1994. Under Title VII, a claimant must file a charge of discrimination with the EEOC within 300 days after the alleged discriminatory event. 42 U.S.C. §§ 2000e–5(e). When a plaintiff has not done so, the claim is time-barred. *Butts v. City of New York Dept. of Housing,* 990 F.2d 1397, 1401 (2d Cir.1993). Caruana's claims regarding denial of promotion are therefore time-barred.

## C. Robert Gusciora

■ Plaintiff Robert Gusciora alleges that he was terminated on account of his age, in violation of the ADEA, the Civil Rights Act of 1991, and the HRL. Prior to his termination in January 1994, Gusciora was employed as a Technical Specialist/Project Manager in Xerox's Office Document Systems ("ODS") unit. In December 1993, Gusciora's manager, Larry Wood, filled out Gusciora's CAF, giving him a score of 11 out of a possible 20. The lowest-ranked eighteen employees, including Gusciora, were terminated.

In support of his claim, Gusciora alleges the following. He states that at the time of his termination, he was just a few months short both of thirty years of service with Xerox and of his fifty-second birthday. He states that had he reached both those marks, his retirement benefits would have greatly increased. He alleges that Xerox terminated him in part to deny him those benefits. He also alleges that, at Xerox's urging, he voluntarily served as the Electronics Division Chairman of the American Society for Quality Control ("ASQC"), but that he received a negative comment about spending too much time on that position in his 1992 performance evaluation. Gusciora states that when he asked one of his supervisors, George Baker, about why he had received a relatively low raise in 1992, Baker said that "there was no money for older employees who'd been making 'bigger bucks.'" Gusciora Aff. ¶ 114. Gusciora states that in March 1993, another supervisor showed him a stack of documents that Gusciora had produced in 1992, and told him that "this wasn't very much" to justify Gusciora's "large" salary. *Id.* ¶¶ 15, 16. Gusciora responded that he had been working on a project that did not generate many

documents. Despite Gusciora's efforts to demonstrate that he earned every penny he got from Xerox, his supervisors continued to believe that he was overpaid. Gusciora also states that in December 1993, one month before he was terminated, he received an award for his work on a certain project, with an accompanying letter stating, "It was the best issue ever," and "We don't know what we would've done without you." *Id.* ¶ 120.

■ These allegations do not give rise to an issue of fact about whether Xerox's proffered reason for Gusciora's termination was a pretext for discrimination. First, Gusciora's claim that he was terminated because he close to the point when he would have had a "bridge to retirement," *id.* ¶ 4, besides being completely unsubstantiated, is not suggestive of age discrimination. "[A]n employer's concern about the economic consequences of employment decisions does not constitute age discrimination under the ADEA, even though there may be a correlation with age. *Hazen* made clear that employment decisions driven by factors that are empirically intertwined with age are not discriminatory so long as they are motivated by 'some feature other than the employee's age.' Thus, decisions motivated by economic concerns do not violate the ADEA." *Criley v. Delta Air Lines, Inc.,* 119 F.3d 102, 105 (2d Cir.1997) (quoting *Hazen,* 507 U.S. at 609).

There is also no evidence that the negative comment about Gusciora's spending time on his ASQC position in 1992 was in any way related to his age. Furthermore, the complaint itself alleges that "when Plaintiff questioned his immediate supervisor, George E. Baker, about the negative comment it was struck from the appraisal." Complaint ¶ 18(c).

■ As to the allegations concerning Baker's alleged "bigger bucks" comment, and Gusciora's supervisors' demanding that he justify his salary, they too relate only to economic concerns, not to Gusciora's age. The fact that age may have some correlation with salary does not mean that an employer's concerns about high-salaried employees is indicative of age discrimination. *Schiltz v. Burlington Northern R.R.,* 115 F.3d 1407, 1411–12 (8th Cir.1997); *Anderson v. Baxter*

*Healthcare Corp.*, 13 F.3d 1120, 1125–26 (7th Cir.1994); *Hamilton v. Grocers Supply Co.*, 986 F.2d 97, 99 (5th Cir.), *cert. denied*, 508 U.S. 960, 113 S.Ct. 2929, 124 L.Ed.2d 679 (1993).

■ Gusciora's receipt of an award in December 1993, and his claim that he always performed his work satisfactorily, are of little significance. First, whether Gusciora was able to perform his duties well is not the issue, since he was not fired for cause, but terminated in a RIF. "Because this was a RIF, what mattered was not whether [Gusciora] was able to do his job, but how well he did it compared to his coworkers." *Coleman v. Prudential Relocation*, 975 F.Supp. 234, 247 (W.D.N.Y.1997). Moreover, if Xerox had indeed been looking for an excuse to terminate Gusciora because of his age, it would make little sense to give him an award only a month before his termination.

Aside from the overall deficiencies in plaintiffs' statistical evidence, Gusciora is also one of the subjects of Smethurst's three regression analyses. At his deposition, Smethurst stated that when he ran this analysis, he could not find a statistically significant difference between the termination rates of employees 40 and older and those under 40, and that therefore he could not rule out the possibility that Gusciora's age was not a factor in his termination. Smethurst Depo. at 402.

### D. George Hamann

■ Plaintiff George Hamann alleges that he was terminated because of his age in violation of the ADEA, the Civil Rights Act of 1991, and the HRL. Hamann was terminated from his position as a Model Shop Supervisor in CSS in January 1994 at the age of 58. In December 1993, Hamann's manager, Thomas Gargana, after meeting with two other managers, gave Hamann a score of 8 out of a possible 20 on Hamann's CAR Hamann had the lowest score of the twenty-two employees who were rated in his group, and he was terminated in the RIF.

In support of his claims, Hamann makes the following allegations. He states that throughout his employment with Xerox, he consistently received favorable performance reviews, and was never advised of any problems with his work. Nevertheless, in September 1993, he was removed from his supervisory position. He was not told the reason, but "off the record" he was told that he "had not seen 'eye to eye' with management." Hamann Aff. ¶ 11. He was told that he would be put in a new position, but that did not happen and he was left with no work to do. He was also asked to train his replacement as Model Shop Supervisor, Don Piciotte, a "much younger" man with much less experience than Hamann. *Id.* ¶ 1 3. He claims that there were numerous positions which he could have been given that were instead filled by contract workers.

These allegations fall far short of what is needed to defeat Xerox's motion for summary judgment. There are two problems with Hamann's allegation that he had always performed well. First, as already stated, an employee's subjective view of his own performance is insufficient to create a triable issue of fact on the issue of pretext. *Viola*, 42 F.3d at 718; *Shapolia*, 992 F.2d at 1039. Second, even if Hamann had been a good employee, that is beside the point, since he was not fired for cause, but only because of his score compared to his coworkers'. *Coleman*, 975 F.Supp. at 247.

■ The allegation about being removed from his position because he did not see "eye to eye" with management also fails to give rise to an issue of fact. First, this is utter hearsay, and plaintiff does not even allege who made the statement. Second, even if the statement were made, being removed from a position because one does not see "eye to eye" with management does not constitute age discrimination. Third, Hamann himself, when asked at his deposition why he believed his age was a factor in his removal from the supervisory position, said,

I base it on, mainly, about the computers and the ability to adapt to these. What can I say, maybe to adjust to the new way of doing business. Everything is computerized. It's not one of my fortes. I think Don Picotte may have been more proficient in the computer part of the business. I think that part of the age discrimination, [sic] I think that was against me.

Hamann Depo. (Defendant's Motion for Summary Judgment Ex. F) at 194. He also stated, "everything was being computerized, and I don't know if I was ready for that. I liked to do things the old way," that he "wasn't fast to change into the computerized systems," and that he was "set in his ways." *Id.* at 194–95.

■ None of these allegations relate to age discrimination. Certainly a company has a right to give a preference to employees who are more proficient in using computers without incurring liability for age discrimination. That is so even if Hamann's being "set in his ways" was somehow related to his age. *See Sheehan,* 104 F.3d at 942 (holding expert statistical evidence inadmissible in ADEA case, since expert had failed to correct for potential nondiscriminatory reasons for disparity in termination rates of older and younger employees, particularly "the more than remote possibility that age was correlated with a legitimate job-related qualification, such as familiarity with computers").

■ The allegation that he was replaced by Picotte is also insufficient to support Hamann's claim. "Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not, in and of itself, prove discrimination." *Futrell v. J.I. Case,* 38 F.3d 342, 348 (7th Cir.1994). Replacement by a younger person may be enough to satisfy the fourth element of plaintiff's prima facie case, but it is not enough to create an issue of fact about whether Xerox's proffered reason for Hamann's termination was pretextual. *Coleman,* 975 F.Supp. at 242; *Ragland v. Rock–Tenn Co.,* 955 F.Supp. 1009, 1022 (N.D.Ill.1997).

As to the statistical evidence, Smethurst conceded that the numbers of people in the groups against whom Hamann could have been compared (seven people whom Hamann was compare to during the RIF process, or twenty-four people in the larger group within which he worked) were too small to be capable of yielding any statistically significant results. Hamann Depo. at 334–35. That is indeed true. *See Pitre v. Western Elec. Co.,* 843 F.2d 1262, 1268 (10th Cir.1988) (sample sizes ranging from two to twenty-four people were too small to produce meaningful use of statistics); *Coleman,* 975 F.Supp. at 240 (statistical evidence about RIF in which nine out of nineteen employees were terminated was meaningless due to small number of people involved).

### E. Eugene Hosenfeld

■ Plaintiff Eugene Hosenfeld alleges that he was terminated on account of his age, sex, and disability, in violation of the ADEA, Title VII, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* and the HRL. Prior to his termination in January 1994 at the age of forty-nine, Hosenfeld was employed as a Stores Material Planner I in CSS. In December 1993, Hosenfeld's manager, Thomas Gargana, and two other managers completed Hosenfeld's CAF, giving him a score of 7 out of a possible 20. Out of the eight employees in Hosenfeld's group, the bottom four, including Gargana, were terminated.

Hosenfeld alleges the following in support of his claims. He alleges that during his employment at Xerox, he was often asked to train new recruits. Many of these were young women, who typically would be moved to other groups after their training, and subsequently promoted. Hosenfeld spoke to a Xerox representative in Industrial Relations about the fact that these young women were being promoted faster than he, but Hosenfeld "never received a satisfactory response." Hosenfeld Aff. ¶ 112. Hosenfeld also states that in recognition of his good performance, in early 1992 he was promoted to Spares Specialist, which had a higher grade level and salary than his prior position. In 1992 and 1993, Hosenfeld went on a lengthy disability leave due to a work-related back injury and the recurrence of an infection that he had contracted during his prior military service. In 1993, other engineering groups began taking over some spare parts functions, and some of Hosenfeld's functions began to be assigned to other persons, including a man in his late twenties and two young women, all contract workers. In March 1993, Gargana told him that Hosenfeld needed to find another job within Xerox, but contrary to Gargana's representations, Gargana did little to help Hosenfeld find a new position,

and Hosenfeld was unsuccessful in doing so. Hosenfeld claims that his former duties are being performed by younger female employees and that Xerox discriminated against him on account of his sex by consistently giving preference to female candidates for promotion and hiring. Hosenfeld also makes the conclusory allegation that Xerox "continuously" discriminated against him from 1992 until his termination on account of his disability, though neither his affidavit nor the complaint makes a single factual allegation in support of that assertion.

Hosenfeld's allegations do not give rise to a genuine issue of fact regarding any of his claims. First, any claim based on his allegation that he often trained young female recruits who went on to receive promotions, and that women were consistently given preference in promotion and hiring, is time-barred by the 300–day limitation periods of the ADEA and Title VII *See* 29 U.S.C. § 626(d); 42 U.S.C. § 2000e–5. Hosenfeld filed his EEOC complaint on September 1, 1994, so he may only raise claims relating to events that occurred on or after November 4, 1993. At his deposition, Hosenfeld identified several women who were the subject of these allegations, and all of the events involving these women occurred well before November 4, 1993. Hosenfeld Aff. (Defendant's Motion for Summary Judgment Ex. G) at 210–14.

Moreover, aside from the fact that these women were promoted, there is no evidence to support Hosenfeld's conclusory allegation that Xerox consistently gave preference to women. That employees get promoted from time to time is an unremarkable fact of business life. In addition, though Hosenfeld stated at his deposition that "we were always vying for" open positions, he was able to identify only one opening that he applied for and that was filled by a woman, and he has not provided a shred of evidence that her sex was a factor in the decision to give the job to her. The sole fact that a woman got the job is not enough to defeat Xerox's summary judgment motion; if it were, an employer could face a lawsuit every time at least one man and one woman applied for the same position. Hosenfeld testified that positions that became open in the Model Shop area

"were filled by mostly female" employees, Hosenfeld Depo. at 214, but he has not provided any evidence indicating how many men and women applied for those positions, the candidates' qualifications, or any other evidence suggestive of sex discrimination. Moreover, Hosenfeld's claim that women were given preference in promotion is undercut by his own statement that he was promoted in 1992, which increased his grade level and salary. In short, there is simply no evidence to support this claim.

Hosenfeld's allegation that in 1993, some of his functions began to be assigned to other persons is demonstrated by his deposition testimony not to be probative of discrimination. Hosenfeld testified at his deposition that in 1990, he came up with the idea to have the Model Shop, where he worked, order manufacturers' parts for other Xerox organizations, since it would be more efficient to have one organization do all the ordering. He agreed with the statement that "in 1993 this process began to reverse itself ...," as some of the organizations for whom the Model Shop had been ordering parts began to take back that function and ordering parts themselves. Hosenfeld Depo. at 116. The three younger contract employees whom he said assumed some of his functions worked in those other groups. *Id.* at 118, 128–30.

It is plain from Hosenfeld's own testimony, then, that the transfer of some of his functions had nothing whatever to do with his age. This occurrence was simply the result of business decisions about how to obtain spare parts. To think that these other Xerox units made these decisions because of Hosenfeld's age would be ludicrous.

The allegation that he was told to look for another job in March 1993, and that he was given little assistance in finding a new position, is not indicative of any kind of discrimination. Hosenfeld does not state why he was told to find a new job, and there is no indication that it had anything to do with Hosenfeld himself; the implication seems to be that there was not going to be enough work for him to do. Hosenfeld also makes the conclusory allegation that he "was not allowed to pursue" openings in other posi-

tions, Hosenfeld Aff. ¶ 18, but he does not explain how anyone prevented him from seeking other jobs. As to Hosenfeld's allegation that Gargana "set up only two interviews," *id.,* Hosenfeld's dissatisfaction with the amount of assistance that Gargana gave him is not enough to sustain a discrimination claim, and there is no evidence of any discriminatory animus on Gargana's part.

■■■ Hosenfeld's ADA claim requires little discussion, as there is no evidence whatsoever to support it. Glaringly absent from both the complaint and Hosenfeld's affidavit is any specific factual allegation that would tend to connect Hosenfeld's disability with his termination. Hosenfeld simply says that Xerox "continuously" discriminated against him, period. For a plaintiff in a discrimination case to survive a motion for summary judgment, he must do more than present "conclusory allegations of discrimination," *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.) *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); he must offer "concrete particulars" to substantiate the claim. *Id.* Hosenfeld's allegation that he was discriminated against on account of his disability is as conclusory an allegation as they come.

As to the statistical evidence, Smethurst admitted that since Hosenfeld was only compared to nine other employees for purposes of the RIF, the number of people was so small that any analysis of those numbers "would neither be able to prove nor disprove discrimination based on the nine alone." Smethurst Depo. at 356. There would be, as he put it, "[n]o proof of anything one way or the other." *Id.* at 357.

## F. Edward Lalik, Jr.

■■■ Plaintiff Edward Lalik, Jr. alleges that he was terminated on account of his age in violation of the ADEA and the HRL. Lalik also alleges that he was terminated in violation of the Vietnam Era Veterans' Readjustment Assistance Act ("VEVRA"), 38 U.S.C. § 2012. Prior to his termination in January 1994 at the age of fifty, Lalik was employed as a Manufacturing Material Analyst I in CSS. In December 1993, Lalik's manager, Gerald Stonewell, filled out CAFs for the employees who reported to him. Lalik was given a score of 10 out of a possible 20. Out of the seventy-seven employees in Lalik's group, the lowest-ranking four, including Lalik, were terminated.

Lalik makes the following allegations in support of his claims. He states that his transfer to the Material Analyst position left him vulnerable to layoff because he was the newest person on the job, though he does not expressly allege that this transfer was discriminatory. He also alleges that when he assumed that position, he was given a different job from the one he was supposed to have, involving tasks with which he was not familiar. He alleges that around May 1993, a young male, Andrew Strezpeck, who was the son-in-law of a Xerox Vice–President, was hired into Lalik's department as a contract worker. Lalik claims that almost immediately after Lalik was terminated in January 1994, Strezpeck was hired as a full-time employee performing the same duties that Lalik had performed. Lalik also states that in violation of Xerox policies, he was never given a performance appraisal for 1992 or 1993, but that he has discovered that his personnel record contains negative appraisals for both those years, the existence of which Lalik was not aware of prior to his termination. Lalik further contends that after his termination, a younger contract worker, Patrick Nolan, was hired to perform Lalik's prior duties.

■■■ These allegations do not give rise to a genuine issue of material fact regarding any of Lalik's claims. His allegations about his transfer to the Material Analyst position have no connection to age discrimination. Lalik was put in this position over two years before the RIF was announced, and there is no evidence that anyone involved in Lalik's transfer had any reason to believe that a RIF was in the offing. Lalik himself admitted at his deposition that he had no reason to believe that his age had anything to do with these matters. Lalik Depo. (Defendant's Motion for Summary Judgment Ex. E) at 101, 104. Moreover, this transfer occurred more than 300 days before Lalik filed his EEOC complaint on September 29, 1994, and any claims based on these events are therefore time-barred. 29 U.S.C. § 626(d).

Lalik's allegations about Strezpeck and Nolan assuming Lalik's former duties also fails to create an issue of fact. Lalik admitted at his deposition that he had no personal knowledge of what duties they were performing. He stated that "Drew Strezpeck had to have absorbed some of my responsibilities" because "[t]he work did not go away." Lalik Depo. at 123. He also conceded that he had no knowledge of whether Strezpeck or Nolan took over any of Lalik's former responsibilities. *Id.* at 223. Moreover, the fact that some of Lalik's duties may have been redistributed after the RIF, even to younger employees, is not enough to support an inference of age discrimination. *See Suttell,* 793 F.Supp. at 74 (mere fact that younger, less-experienced employee assumed plaintiff's former duties after plaintiff was terminated in RIF was insufficient to give rise to inference of discrimination). In addition, Lalik's allegation that Strezpeck was the son-in-law of a Xerox executive has nothing to do with age discrimination, and at most suggests that his hiring was the result of nepotism, which is not prohibited by the ADEA.

As to Lalik's 1992 and 1993 performance assessments, Lalik has not shown how Xerox's alleged failure to show him those assessments when they were completed is probative of age discrimination. More importantly, he conceded at his deposition that he had no evidence that his age had anything to do with the negative statements in those appraisals. Lalik Depo. at 214. He said that "[i]ndirectly" he had reason to believe that the appraisals were negative because of his age because they were "written to get rid of—I'm going to say a more senior person," but when asked if he based that belief on any facts, he said "No." *Id.* at 222.

As stated before, an employee's disagreement with his employer's negative assessment of his performance is not enough to support a discrimination claim. *Viola,* 42 F.3d at 718. In addition, without some facts providing an objectively reasonable basis for Lalik's belief that his age played a part in his negative appraisals, that belief amounts to nothing more than a conclusory allegation

that fails to supply the kind of "concrete particulars" needed to defeat Xerox's motion. *Meiri,* 759 F.2d at 998.

As to the statistical evidence, Smethurst was unable to find any statistical evidence of age discrimination in the group against which Lalik was compared for purposes of the RIF. Smethurst Depo. at 371. Only when he pooled Smethurst's group with a far larger group composed of people with whom Lalik was not compared did he find any statistically significant disparity. *Id.* at 372–73. Plaintiff has not shown how such an analysis can be probative of whether *Lalik* was discriminated against. *Maddox,* 764 F.2d at 1554–56.

Lalik's VEVRA claim also must be dismissed. Aside from the fact that he has not alleged any particular facts in support of this claim other than his allegation that he is a disabled Vietnam Era veteran, the courts that have addressed the issue have held that VEVRA does not provide a private right of action. *See Antol v. Perry,* 82 F.3d 1291, 1298 (3d Cir.1996); *Wikberg v. Reich,* 21 F.3d 188, 189 (7th Cir.), *cert. denied,* 513 U.S. 961, 115 S.Ct. 421, 130 L.Ed.2d 336 (1994); *Harris v. Adams,* 873 F.2d 929, 931–32 (6th Cir.1989); *Barron v. Nightingale Roofing, Inc.,* 842 F.2d 20, 21–22 (1st Cir.1988); *Dawkins v. Hudacs,* No. 94–CV–1655, 1996 WL 12032 *4 n. 6 (N.D.N.Y. Jan.5, 1996); *Heckman v. Olive,* No. CV 88–2981, 1992 WL 390249 *6 (E.D.N.Y. Dec.9, 1992). Lalik has provided no authority to the contrary.

## G. Dominick Maiorano

Plaintiff Dominick Maiorano alleges that he was terminated because of his age in violation of the ADEA and the HRL. Prior to his termination in January 1994 at the age of fifty-one, Maiorano was employed as a Technical Specialist/Project Manager II in ODS. In December 1993, Maiorano's group manager, David Bliek, gave Maiorano a score of 9 out of a possible 20 on his CAF. All six employees who scored a 9 or below in Maiorano's group were terminated.

At the outset, there is an issue regarding whether Maiorano has met the procedural requirements of the ADEA, because he never

filed an administrative charge with either the EEOC or the New York State Division of Human Rights, as required by 29 U.S.C. § 626(d). *See Butts*, 990 F.2d at 1401. Maiorano contends that this failure does not bar his suit because he should be allowed to "piggyback" on the timely filed charges of the other plaintiffs. *See Tolliver v. Xerox Corp.*, 918 F.2d 1052 (2d Cir.1990).

I find it unnecessary to decide this issue, because even if Maiorano could piggyback on the other plaintiffs' administrative complaints, his age discrimination claim is even weaker than the others discussed thus far. Aside from broad, conclusory allegations that older workers were terminated in disproportionate numbers (an allegation that plaintiffs' expert's testimony does not support), the only particulars that Maiorano has alleged in support of his claim are that: he had always performed his job well; he had been told by his supervisor, Joseph Hruschak, that he did not have to worry about being laid off because he had always performed well; he had obtained a number of patents for Xerox; and the "statistical base" of persons in his group "was overwhelmingly skewed against persons over forty years of age," whatever that means. Complaint ¶ 18(f); Maiorano Aff. 12.

As noted with respect to the other plaintiffs, whether Maiorano had performed capably is not the issue. "[E]ven capable employees are released when an employer is downsizing, and therefore evidence of competence is not particularly probative." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 779 (8th Cir.1995). What matters is how Maiorano stacked up when measured against his coworkers. *Coleman*, 975 F.Supp. at 247. Regardless of how Maiorano views his own comparative performance, he cannot survive summary judgment without coming forward with some evidence that Xerox's evaluation of him was false and that age discrimination was the real reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995); *Fisher v. Vassar College*, 114 F.3d 1332 (2d Cir. 1997) (en banc), *petition for cert. filed* (U.S. Sept. 2, 1997) (No. 97–404). He has not done so.

Plaintiff has not even explained how the numbers of people in his group were "skewed" against persons over forty, much less provided any evidence in support of that allegation. Maiorano admitted at his deposition that he did not have any statistical analysis to back up this assertion, and that he did not know the ages of all the people in his group. Maiorano Depo. (Defendant's Motion for Summary Judgment Ex. C) at 259–60.

Likewise, Smethurst testified that he found no statistical evidence of age discrimination in the group within which Maiorano was stack-ranked. In fact, he said that not only did he not perform a statistical analysis of that group, but that he did not even "eyeball" it for any statistical disparities. Smethurst Depo. at 469. Again, the only analysis he performed was of a much larger group composed mostly of people whom Maiorano was not compared with for purposes of the RIF.

An "eyeball" look at the numbers in Maiorano's group further suggests that there was no age discrimination. Eight out of the forty-four employees age forty or older were terminated, and three out of the twenty-five employees under forty were terminated. Thus, the termination rate for employees in the protected category was only marginally higher than that for younger employees.

## H. Patricia Rake

Plaintiff Patricia Rake alleges that she was terminated on account of her age, sex and disability in violation of the ADEA, Title VII, and the ADA. Prior to her termination in January 1994 at the age of fifty-four, Rake was employed as a Material Analyst in CSS. In December 1993, her manager, Arthur Capaccio, gave Rake a score of 8 out of a possible 20 on Rake's CAF. Out of the sixty-six employees in Rake's group who were stack-ranked, the lowest seven, including Rake, were terminated.

In support of her claims, Rake alleges the following. Rake alleges that she took disability leave for three months on two occasions after suffering "nervous breakdowns." Rake Aff. ¶ 10. She alleges that when she returned from leave, she was "subjected to

animosity" from her supervisor, Jack Black, "because [she] had been out on leave and because [she] was holding a position formerly held by a male." *Id.* Apparently the second of these absences occurred no later than 1990, because Rake alleges that in 1990, she was offered a different job under a different supervisor upon her return from disability leave. In 1992, however, Rake went on leave again due to arthritis-related back problems. In April 1993, Rake asked one of her managers whether she should apply for a certain opening because some of her coworkers were told that they should apply. He told her not to worry because her position was secure. Plaintiff heard nothing more about her job until she was notified of her termination. She alleges that her duties were assigned to Joe DiPassio, a man about thirty years old. She also claims that after her termination, she learned that her personnel file contained a negative performance review of which she had previously been unaware.

As to Rake's age and sex discrimination claims, none of her allegations gives rise to a genuine issue of fact. Her deposition testimony makes clear that the only basis for her allegation about her duties being reassigned to DiPassio was some hearsay statements from former coworkers. Rake Depo. (Defendant's Motion for Summary Judgment Ex. E) at 306. Rake admitted she had no personal knowledge of what DiPassio's duties were after Rake was terminated. *Id.* at 304–05. Moreover, as stated previously, the mere fact that after a RIF, a terminated employee's duties are redistributed to other employees does not in itself suggest any discrimination. *Suttell,* 793 F.Supp. at 74; *see also Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1465 (6th Cir.) ("a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work"), *cert. denied,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990). In addition, Rake's sex discrimination claim is undercut by her deposition testimony that she believes that her duties were split after her termination between DiPassio and a woman, Gail O'Keefe. Rake Depo. at 305.

Rake's deposition testimony also reveals that her allegation about being told that she did not need to look for another position because her job was secure is not probative of discrimination. Rake testified that at some time prior to January 1994, a decision was made to outsource certain purchasing functions within her department. As a result, the positions within her department that had been responsible for carrying out those functions would be eliminated, and the affected employees were told to seek other positions. Rake's manager told her that Rake's position was secure because her auditing function would remain regardless of whether Xerox outsourced the purchasing functions. Rake was never told that she was being terminated because her auditing function was being eliminated (in fact, she concedes that that function remains in her department), she admitted that she had no reason to believe that her termination was in any way related to the outsourcing decision, and she said she had no reason to think that her manager knew at the time he gave her the assurance that her job was secure that a RIF would take place some eight or nine months later. Rake Depo. at 310–17. There is absolutely nothing in the record, then, connecting the events concerning applying for another job in April 1993 and the RIF, much less any evidence in this regard that is in any way suggestive of age or sex discrimination.

Rake's allegation that she had been unaware that her personnel file contained a negative performance appraisal fails to give rise to an issue of fact for the same reasons as Lalik's similar allegation. Plaintiff simply makes this allegation without offering any analysis or explanation of its significance, leaving it to the court to guess at how it is supposed to be probative of any relevant issue. As far as I can tell, it is not.

With respect to her sex discrimination claim, Rake also testified that off-color and otherwise crude or sexist remarks were sometimes made by male employees in her presence. Plaintiff, however, has not come forward with any evidence that such remarks were made by anyone involved in the decision to terminate her, or that the remarks were in any way related to that decision. As

stated previously, such remarks are not probative with respect to whether Rake was terminated because she is a woman. *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring); *Ayala–Gerena*, 95 F.3d at 97; *McCarthy*, 924 F.2d at 686; *Nawrocki*, 1997 WL 211338 *3.

■ Rake has not proffered any solid evidence in support of her ADA claim. Her allegations are little better than Hosenfeld's in this regard, amounting essentially to the fact that Rake had a disability and that she was terminated. A logical leap from one to the other is not supportable on this record.

The allegations about Jack Black displaying "animosity" toward Rake after she returned from disability leave suffer from several defects. First, the relevant events occurred no later than 1990, and are therefore time-barred by the ADA's 300–day limitations period (a fact equally true of her conclusory allegation that Black was hostile toward her because she held a position previously occupied by a man). *See* 42 U.S.C. § 12117 (1994) (incorporating 42 U.S.C. § 2000e–5); *Conner v. Reckitt & Colman, Inc.*, 84 F.3d 1100, 1102 (8th Cir.1996); *Penns v. Gannett Rochester Newspapers*, 966 F.Supp. 174, 174–75 (W.D.N.Y.1997). Second, there is no evidence that Black had any involvement in the decision to terminate Rake. Third, Rake has not presented any evidence to support her bald assertion that Black showed "animosity" toward her, and she attributed her belief that he treated her differently to "female instinct." Rake Depo. at 136.

There is also no evidence that Rake was ever subjected to adverse treatment because of her disabilities. She claimed at her deposition that she thinks she was laid off because her arthritis prevented her from fulfilling some of her physical job duties involving heavy lifting, but she said that she did not even know if Capaccio, who filled out Rake's CAF, was aware of her physical restrictions. Rake Depo. at 294. She went on to state that her physical restrictions in no way prevented her from performing her job; that Capaccio never saw her ask for help in lifting objects; and that none of her managers— Capaccio, Coleridge Gill, or George Bush— ever said anything to her indicating that they were aware of her restrictions, or that they thought that her restrictions were affecting her ability to do her job. *Id.* at 295–96.

Moreover, Rake's own testimony indicates that Xerox did try to accommodate her with respect to her disabilities. She stated that after she returned from her first disability leave, her job was changed in some ways to make things easier for her. *Id.* at 185–86. She also testified that after her second absence, another position was found for her, apparently in response to her psychiatrist's recommendation, and that she suffered no decrease in rank or pay. *Id.* at 200–03. She was satisfied with this position, and later received a promotion. *Id.* at 210. In short, Rake's allegation that her disabilities were a factor in the decision to terminate her is wholly speculative and without support in the record.

Rake's statistical evidence is no more probative of discrimination than the other plaintiffs'. Smethurst gave the figures concerning the group in which Rake was stack-ranked only an "eyeball analysis," which revealed no disparity between the rates at which older and younger employees, or male and female employees, were terminated. Smethurst Depo. at 446–47. Even when he analyzed a larger group including Rake's own group and other employees against whom she was not compared during the RIF, he found no statistical evidence of sex discrimination. *Id.* at 447. He did not make any analysis to check for disability discrimination. *Id.* at 446.

As with Maiorano, the numbers themselves also indicate a lack of discrimination. In Rake's group, five out of fifty-three males, and two out of thirteen females were terminated. Six out of sixty-two workers age forty and older, and one out of four employees under forty, were terminated. It therefore appears that males and younger employees were not given any special consideration when it came time to decide whom to terminate.

## I. Pedro Santiago

■ Plaintiff Pedro Santiago alleges that he was terminated on account of his age, and

in retaliation for his prior complaints of discrimination on account of his being Hispanic, in violation of the ADEA, Title VII, and the HRL. Prior to his termination in January 1994 at the age of fifty-three, Santiago was employed as a Dispatcher in CSS. In around December 1993, Santiago's manager, Peter White, gave Santiago a score of 7 out of 20 on Santiago's CAF. Of the twenty-nine ranked employees, the four lowest, including Santiago, were terminated.

In support of his claims, Santiago makes the following allegations. He states that during his employment with Xerox, he filed three internal affirmative action complaints. The first, in 1978, alleged that Santiago had been denied a promotion because he was Hispanic. The second, filed in 1984, alleged verbal abuse by one of his supervisors, and that Santiago had been denied the use of certain equipment because of his ethnicity. The third, filed around 1989 or 1990, alleged that Santiago had been denied a supervisory position because of his ethnicity. Santiago claims that in spite of being denied the position, he was the *de facto* supervisor for some nine months while a new supervisor was trained, but that he received no additional pay during that time. He alleges that White was unfamiliar with Santiago's work when he filled out the CAF, and that White did not take into consideration the fact that Santiago had saved the department $130,000 in the previous six months. He alleges that his duties are being performed by a younger employee who was transferred from another department, and that Santiago was told by coworkers that John Pestka, White's supervisor, stated at a meeting, "Now that we have let go of all of the dead wood, we're in a good position." Santiago Aff. ¶ 17.

With respect to his age discrimination claim, Santiago testified that he believed that his age was a factor in his layoff because Xerox is "greedy" because it prefers to hire young employees who will not command as a high a salary as employees who have been at Xerox for many years. Santiago Depo. (Defendant's Motion for Summary Judgment Ex.

E) at 301–02. As stated, however, an employer's actions motivated by economic concerns do not violate the ADEA, even if the economic factors have a correlation with age. *Schiltz,* 115 F.3d at 1411–12; *Anderson,* 13 F.3d at 1125–26; *Hamilton,* 986 F.2d at 99.

█ Santiago also testified that he believed his age was a factor because he was not given an "opportunity to bump anyone" before he was laid off. Santiago Depo. at 303. Plaintiff has not presented any authority that an employer must give older employees a chance to "bump" younger employees during a RIF. To so hold would be tantamount to saying that the employer would simply have to terminate its youngest employees and retain its oldest employees, without regard to other legitimate, nondiscriminatory factors, such as performance or salary. The ADEA, however, only prohibits them from discriminating *against* older employees; it does not require employers to discriminate in *favor* of them.

Santiago further stated that some younger employees with less experience than he were retained after the RIF. As stated previously, that fact itself is not probative of discrimination absent some evidence that those employees' ages were a factor in Xerox's decision to retain them and not Santiago. *Williams,* 819 F.Supp. at 225; *Suttell,* 793 F.Supp. at 74.

Santiago's allegation that when White made out his CAF, White was unfamiliar with Santiago's work, is of no significance in light of Santiago's deposition testimony that the CAF was "fair." Santiago Depo. at 315. Moreover, even if Santiago believes that parts of the CAF are inaccurate, his subjective views in that regard are no more probative of discrimination than the other plaintiffs'.

The allegation that Santiago's duties have been assumed by a younger employee is also not probative of age discrimination.[5] As stated with respect to the other plaintiffs, it is not unusual after a corporate downsizing for terminated employees' duties to be redistributed among the remaining employees.

---

5. Xerox contends that the employee in question, Paul Farandino, is in fact older than Santiago. I need not address that issue, however, since even if Farandino is younger than Santiago, that fact does not give rise to an issue of material fact.

The fact that a younger employee may end up being assigned those duties is not suggestive of age discrimination. *Suttell,* 793 F.Supp. at 74.

The alleged statement by Pestka about "dead wood" cannot defeat Xerox's motion. For one thing, it is hearsay, and Santiago has not shown that it would be admissible under any hearsay exception. Even if it were admissible, however, it is not related to employees' age. "Dead wood" implies employees who are unproductive or superfluous, and could just as easily include younger employees as older employees. *See E.E.O.C. v. Clay Printing Co.,* 955 F.2d 936, 942 (4th Cir.1992) (consultant's statement about determining which employees were "dead wood" was made in context of employee evaluations, regardless of age, and was not probative of age discrimination); *see also* Webster's Third New International Dictionary (Unabridged) (198 1) (defining "deadwood" as, *inter alia,* "useless personnel or material (as inefficient members of an organization, unsalable stock, or outworn methods)").

■■ To establish a prima facie case on his Title VII retaliation claim, Santiago must show that he engaged in activity protected by Title VII, that defendant was aware of the activity, that plaintiff was subjected to an adverse employment action, and that there is a causal connection between the protected activity and the adverse action. *Tomka v. Seiler,* 66 F.3d 1295, 1308 (2d Cir.1995). "Proof of a causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment, ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, ... or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987) (citations omitted). If plaintiff makes out a prima facie case, the claim is analyzed according to the *McDonnell Douglas/Burdine* burden-shifting analysis. *Sumner v. United States Postal Service,* 899 F.2d 203, 208 (2d Cir. 1990).

Santiago has not adduced any evidence of a causal connection between his prior complaints and his termination. The last of the three complaints was made in 1990, about four years prior to the RIF. That certainly does not show protected activity "followed closely" by his termination. *See Smith v. Cadbury Beverages, Inc.,* 942 F.Supp. 150, 158 (W.D.N.Y.1996) (plaintiffs 1988 and 1991 administrative complaints were too remote in time to show causal connection to January 1993 suspension), *aff'd,* 116 F.3d 466, 1997 WL 314737 (2d Cir.1997); *Lees v. Case–Hoyt Corp.,* 779 F.Supp. 717, 727 (W.D.N.Y.1991) (no causal connection where plaintiff was suspended eighteen months after first verbal complaint and four months after administrative complaint was filed).

Santiago has also not proffered any evidence that coworkers were retaliated against for making similar complaints, nor has he come forward with any direct evidence of discriminatory animus. In fact, he testified at his deposition that he did not know who made the decision to lay him off, or whether the person or persons who made that decision were even aware that he had made prior complaints of discrimination. Santiago Depo. at 324. In short, Santiago's retaliation claim is based upon sheer speculation and surmise.

Santiago's statistical evidence is equally lacking in probative value. Smethurst testified that he did not perform an analysis of the group of twenty-nine people in which Santiago was stack-ranked because it was "too small a sample" to yield a statistically significant result. Smethurst Depo. at 461. When asked whether an analysis of that group would reveal no significant disparity between the termination rates of forty-and-over and under-forty employees, Smethurst responded, "That's right." *Id.* at 462. In addition, Smethurst performed no statistical analysis of the termination rates of Xerox employees who had previously complained about discrimination. *Id.* at 463.

### J. Julie Scribner

■■ Plaintiff Julie Scribner alleges that she was terminated on account of her age and sex in violation of the ADEA, Title VII,

and the HRL. Prior to her termination in January 1994 at the age of fifty-four, Scribner was employed as a Data Entry Clerk in CSS. Around December 1993 or January 1994, Scribner's manager, James Allocco, gave Scribner a 7 out of a possible 20 on Scribner's CAF. Scribner's score was the lowest of the nine employees with her skill code in CSS who were ranked.

Plaintiff makes the following allegations in support of her claims. She alleges that despite her requests, she never received training to be a "dedicated operator," which prevented her from receiving promotions. When an opening occurred for an exempt analyst position, it was filled by a younger woman. Younger people were consistently brought into Scribner's group and promoted to positions higher than Scribner's. Scribner's 1991 performance appraisal blamed an inaccuracy on "human error," and although her supervisor admitted that the error could have been someone else's, the statement remained in her appraisal.[6] In March 1992, Scribner was moved to an isolated area in a warehouse in Henrietta, New York, and given "no support whatsoever ..." Scribner Aff. ¶ 13. Nonetheless, she performed satisfactorily, and with the exception of the 1991 appraisal, she received favorable performance reviews until her termination. She also alleges sex discrimination because she was the only female in her immediate work area and therefore "felt the brunt of [her] male dominated work place ..." *Id.* ¶ 17.

These allegations fail to create any issue of material fact. First, Scribner's allegation about not receiving training is contradicted by her own deposition testimony. She testified that Xerox not only reimbursed her for taking college courses, but that she took training courses in time management, improving communications, ergonomic training, and several others. Scribner Depo. (Defendant's Motion for Summary Judgment Ex. E) at 7, 143. Furthermore, even if Scribner was denied training in some particular area, she has proffered no evidence to show that her age or sex was a factor.

Scribner's allegation about a younger woman being promoted over her is likewise unprobative. She admitted at her deposition that she had no idea what the woman's background or prior experience was, and the mere fact that the woman was younger than Scribner is not enough to show age discrimination. "[L]osing out to a younger candidate, without more, is insufficient to show pretext." *Coleman,* 975 F.Supp. at 247 (citing *Monaco v. Fuddruckers, Inc.,* 1 F.3d 658, 661 (7th Cir.1993)); *see also Hambas v. Board of Trustees, State Univ. of New York,* No. 93–6467, slip op. at 10 (W.D.N.Y. Nov. 7, 1996) (fact that younger candidates were chosen for position sought by plaintiff, without more, did not show that defendant's proffered reason for choosing them was pretextual), *aff'd,* 116 F.3d 465, 1997 WL 338850 (2d Cir.1997). In addition, this event occurred in 1990, *see* Scribner Depo. at 59, and is therefore time-barred by the ADEA's 300–day limitations period. 29 U.S.C. § 626(d).

Scribner's allegation about the unfair comment in her 1991 performance appraisal about "human error" also fails to give rise to an inference of discrimination. First, as already stated, an employee's disagreement with the accuracy or fairness of performance reviews is insufficient to show discrimination. Furthermore, the force of this allegation is undercut by Scribner's own allegation that after 1991, she received satisfactory reviews up until her termination.

Scribner's allegation about being moved to an isolated position with no support in 1992 is not indicative of discrimination. For one thing, Scribner alleges that in spite of this transfer, she performed satisfactorily and received satisfactory reviews, so it is not apparent how this transfer had any adverse effect on her. In addition, there is no evidence that her age or sex had anything to do with the move. Scribner testified that she "felt" that they were factors because she was "a certain age at that time" and "a certain sex." Feelings are not evidence. Without an objectively reasonable basis for those feelings, they are irrelevant.

---

**6.** It is not clear what sort of "inaccuracy" the appraisal referred to, since plaintiff has not taken the trouble to submit a copy of the appraisal to the court.

The same can be said of Scribner's allegation that she felt the "brunt" of her "male dominated" workplace because she was the only woman in her immediate area. Aside from the fact that Scribner has not presented a shred of evidence indicating that she had no female coworkers (in fact, the evidence indicates that all of the employees with whom Scribner was stack-ranked were women, *see* John R. Bloom Aff.Ex. B; Smethurst Depo. at 280), being surrounded by men is not sex discrimination. Scribner has not presented any evidence that she was subjected to sexual harassment, and she has not articulated what it means to bear the "brunt" of a "male dominated work place."

Scribner's statistical evidence is equally unprobative. Smethurst testified that an analysis of the group with whom Scribner was stack-ranked revealed *no statistically significant evidence of age or sex discrimination.* Smethurst Depo. at 280–81. His testimony that there was evidence of age discrimination was based only upon his analysis of a large group of employees that Scribner was not compared to in the RIF process, and who were under different decisionmakers during the RIF. *Id.* at 282. That evidence is not probative of whether Scribner was discriminated against. *Maddox,* 764 F.2d at 1554–56.

## K. John Bernard Smith

 Plaintiff John Bernard Smith alleges that he was terminated on account of his age in violation of the ADEA and the HRL. Prior to his termination in January 1994 at the age of fifty-four, Smith was employed as a Manufacturing Material Analyst in CSS. In December 1993, Smith's manager, Gerald Stonewell, gave Smith a rating of 10 out of a possible 20 on Smith's CAP. Out of the seventy-seven employees who were stack-ranked in Smith's group, the bottom four, including Smith, were terminated.

In support of his claims, Smith alleges the following. He states that around 1988, he took over a job with twenty-four "demand parts" (apparently parts he was responsible for). By April 1993, the job had 180 demand parts. He was removed from position in April 1993. For some five years prior to then, he consistently worked overtime, but did not receive overtime pay. Beginning around October 1992, Xerox began to make a "number" of directives that made it difficult for Smith to perform his job, although from Smith's affidavit it appears that the "number" is one, since the only one he identifies is a directive that he keep certain inventory at "current month plus one month of supply," which caused bulk shortages and affected inventory flow. Smith Aff. ¶ 11. Smith was blamed for these problems even though they were not his fault. "To make matters worse," when Smith was removed from this position in April 1993, he was replaced by a woman, Cindy Brocka (Smith does not assert a sex discrimination claim, so it is unclear how this "made matters worse"). *Id.* ¶ 12. Brocka (who Smith estimated was about "41, 42" years old, Smith Depo. (Defendant's Motion for Summary Judgment Ex. E) at 112), was given overtime pay and was not required to follow the directive about maintaining inventory at a certain level. Smith states that after his termination, he was told by former employees that his duties had been assumed by Andrew Strezpek (the same man who Lalik alleges assumed his duties), a male under forty years of age. He also alleges that after his termination, he requested his personnel file, and discovered that it contained a negative performance appraisal that he had never seen before.

These allegations do not support an inference of discrimination. Smith's allegations about the number of demand parts he handled until April 1993 are not only unprobative of discrimination, they are contradicted by his own deposition testimony. The following colloquy occurred during his deposition:

Q. . . . What did you do after April of '93 that was different than before April of '93?

A. I took over some parts from one of my peers, you know, we shuffled numbers around in the office. They do that every so often, and so I took over parts from other people.

Q. All right. Did you believe that shuffling this time was due to your age?

A. Well, I just—the way it came about, I think they were kind of grooming youn-

ger people to handle these—you know, to handle these numbers, these jobs.

Q. Okay. Were there some of these 180 parts that you continued to handle after April of '93?

A. Yes.

Q. And you still had the same job title and salary?

A. Right, right.

Q. You were just handling different parts?

A. Handle different parts.

Q. Some different parts?

A. Lot of different parts, but continued to keep five or six. I don't remember the number, a small number, of the problem ones.

Smith Depo. at 223–24. Smith also testified that the parts he used to handle were assigned to four other people, including a man in his middle fifties. *Id.* at 224.

All this shows, then, is that, as happened "every so often," some parts were "shuffled around" among various people in Smith's office. Smith offered no objective basis for his belief that Xerox was "grooming younger people" to handle his duties, and at any rate there is nothing unlawful about training younger, less experienced workers to handle greater responsibilities. Moreover, Smith retained the same job title and salary; he simply became responsible for different parts. None of this suggests any age discrimination.

Smith's allegations about not receiving overtime pay, being blamed for problems caused by Xerox's directive concerning, and Cindy Brocka being treated differently in those respects, likewise do not support his claims. For one thing, any claim based on these matters is time barred by the 300–day limitations period. Smith filed his EEOC complaint on September 21, 1994, and these incidents occurred no later than April 1993, well before the cut-offdate of November 24, 1993.

Second, Smith testified that he did receive some overtime pay prior to April 1993. Smith Depo. at 116. He also testified that although he frequently worked overtime for which he was not paid, Brocka did as well,

and he did not know how many overtime hours she was not paid for. *Id.* at 117. He also conceded that he had no reason to believe that the directive about maintaining inventory was issued because of his age, *id.* at 227, and that Brocka assumed some of Smith's duties "because she wasn't all that busy." *Id.* at 89. Smith's contention that Brocka was shown favoritism because she "was allowed more leeway as far as volume of material and when she could send material to the Canadian operations," *id.*, is at most a scintilla of evidence of age discrimination, which is insufficient to defeat Xerox's motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Yerdon v. Henry*, 91 F.3d 370, 374 (2d Cir.1996). Even if Brocka was treated more leniently in those respects, there is no evidence that this was occasioned by her being younger than Smith.

The allegation that Smith's former duties were assumed by Strezpek (apparently doing yeoman's service, having assumed both Smith's and Lalik's duties) fails for the same reasons stated with respect to the other plaintiffs' similar allegations. This allegation is based on hearsay, and even if it were admissible, it would not suffice to defeat Xerox's motion. Merely because those duties continued to be performed by a younger person does not support an inference of age discrimination. *Suttell*, 793 F.Supp. at 74.

The allegation that Smith discovered an unfavorable performance review in his file after he was terminated also fails to support his claim for the same reasons stated with respect to Lalik and Rake. It is not apparent how this is suggestive of discrimination, and whether Smith personally believes the appraisal to be accurate or not is beside the point, absent some concrete evidence that the appraisal was deliberately made falsely unfavorable because of Smith's age. No such evidence has been presented.

Smith's statistical evidence fails to suggest any age discrimination. Smith was in the same group as Lalik, and as stated, Smethurst did not find any evidence of age discrimination within that group.

## L. Harold Wado

Plaintiff Harold Wado alleges that he was terminated because of his age and sex, in violation of the ADEA, Title VII, and the HRL. Prior to his termination in January 1994 at the age of fifty-three, Wado was employed as a Manager in the Marketing Support unit within DSS. In December 1993, Wado's manager, John Papietro, gave Wado a score of 12 out of a possible 20 on Wado's CAP. After Wado's score was reviewed by a group of senior managers, it was lowered to 11. Out of the group of 172 employees in which Wado was stack-ranked, seven of the employees who scored eleven or lower (it appears that there were eleven such employees, see Philip Ondocin Aff.Ex. B) were terminated. The four exceptions were a man and woman both of the age of sixty-three, and a man and woman both age fifty.

Wado makes the following allegations in support of his claims. He alleges that he always performed well in his Manager position, raising profits and staying under budget. Nonetheless, in September 1993, Xerox effectively took control of the Marketing Group from Wado because his manager "offered [Wado's] operating budget to another group ..." Wado Aff. ¶ 12. In December 1993, Wado was "surprised" when his group's comptroller, David Voke, criticized him "for going slightly over budget, even though the profits from [Wado's] group still exceeded [his] targeted goals." Id. ¶ 14. He states that he was told at one point that part of his duties included bringing qualified women into his department, which he did. Wado alleges that after he was terminated, he heard from someone that he was replaced by one of the younger women he had brought into the department, Donna Covannon.

These allegations are insufficient to give rise to a genuine issue of material fact. As stated, the fact that an employee performed his job well is irrelevant in the context of a case involving a RIF, since Wado was not fired for cause, but terminated because of his ranking relative to his coworkers. Wado's claim that his budget was somehow reduced in September 1993 is also not probative, since Wado has not proffered any evidence suggesting that his age or sex was a factor in that decision. Wado testified at his deposition that he believed that Xerox was "trying to build a case to let me go," but he has not presented any evidence to support his conclusory allegation that his age or sex was involved. Wado Depo. (Defendant's Motion for Summary Judgment Ex. E) at 104. His testimony also made clear that neither his budget nor his control of the Marketing Group was literally taken from him. He stated that only "a piece" of his budget was removed, and that he remained in control of the Marketing Group. Id. at 139–40.

Wado also has not submitted any evidence to support his allegation that Voke criticized him for going over budget in December 1993 for discriminatory reasons. When asked at his deposition why he believed that his age was the reason for this criticism, Wado replied, "I'm basing it on the fact that I believe that this was the premise to them building some sort of a case to get rid of me, and I couldn't believe that it had anything to do with performance so they had to come up with other reasons. And as I said, my belief is that yes, they do want to get rid of the older employees; too many benefits, too high a salary." Id. at 143–44. He stated that he had no "[s]ubstantial facts" to support this claim other than certain conversations he had had with some people. Id. at 144. The only conversations that he testified to, though, were comments by unidentified people "that this age group was in danger, 'they would like to get rid of us' ..." Id. at 53. He said that some other older employees who were terminated "made comments like ... 'We have been here too long. We have too many benefits. They would like to get rid of us.'" Id. at 54. In other words, Wado relies only on unattributed hearsay by other employees who shared his belief that older employees were being discriminated against. Unsubstantiated opinions do not gain evidentiary weight merely by being repeated from one person to another. In addition, most of these comments, and Wado's own opinion, indicate that Xerox wanted to get rid of older employees not because of their age *per se*, but because of their high salaries. That does not equate to age discrimination. *Criley*, 119 F.3d at 105.

There is also no evidence to support Wado's claim that he was discriminated against because he is a male. His assertion (based solely on hearsay) that Covannon has assumed his former duties is not enough to defeat a summary judgment motion, absent further evidence that her sex was a factor. The law does not impose an obligation on employers to make sure that whenever an employee is terminated, the employee's duties are assigned to someone of the same sex.[7]

Wado also testified that while he worked at Xerox as a Manager, "there was preference to the affirmative action targets if you were to pick a female, for example." Wado Depo. at 167. This does not relate to terminations, however, and there is no evidence that any preference was given to women during the RIF. In fact, he stated that there was no preference given to women for purposes of filling out performance appraisals. *Id.* at 29.

■ Wado's statistical evidence is also not probative. Smethurst stated that an analysis of the group of 183 people in Wado's group[8] yielded "a non-significant result because of the [small, in his view] size of the sample here." Smethurst Depo. at 483. He also stated that when he performed a regression analysis of that group, he found no statistically significant disparity between the termination rates of older and younger employees. *Id.* at 484–85. In addition, even when he analyzed a much larger group including employees whom Wado was not ranked against, he found no evidence of sex discrimination. *Id.* at 492.

Notably, in Wado's group, three out of fifty-five female employees, and four out of 128 male employees were terminated. That means that females actually had a *higher* termination rate than males. There is sim-

ply no evidence, then, that Wado was discriminated against on account of his sex.

## M. Phillip D. Cufari

Plaintiff Phillip D. Cufari alleges that he was terminated on account of his age, in violation of the ADEA and the New York HRL. Cufari also alleges that he was terminated on account of having had heart bypass surgery, in violation of the ADA. In November 1992 Cufari began experiencing severe chest pains and, following invasive testing, underwent emergency bypass surgery. He was out from work from December through March 1993, at which time he returned to work part-time for a period of four to six weeks. He then resumed full-time employment. He asserts that his termination in January 1994 was the result of unlawful disability discrimination arising out of those events.

Prior to his termination in January 1994 at the age of 53, Cufari was employed as a Manager for Central Industrial Relations, in Corporate Strategic Services (CSS). In December 1993, Cufari's manager James Playfair completed his CAF giving him a score of 8 out of a possible 20. Other upper level managers including William Roscoe stack ranked the forty-four employees in Cufari's work group. Those in the bottom 23% (ten employees including Cufari) were selected for the RIF.

With respect to his age discrimination claim, Cufari alleges that his termination was the result of disparate treatment discrimination by Xerox.[9] In support of this claim he alleges the following. Throughout his thirty-year career with Xerox he consistently received favorable performance reviews and several promotions. In 1990 he received a performance evaluation by his then direct supervisor, William Roscoe, which was "laced with a subtle change in . . . tenor" concern-

---

7. Xerox alleges that in fact Wado's duties were assumed by John Papietro. *See* Papietro Aff. ¶ 7. This issue is not material to Xerox's motion, however, since even if Covannon did assume Wado's former duties, that is not enough to defeat Xerox's motion.

8. Smethurst's report states that there were 172 people in Wado's stack-ranked group. His reference at his deposition to 183 people relates to the

fact that Xerox's expert, David E. Bloom, used that number. The reasons for the discrepancy are not apparent.

9. In his complaint Cufari also pled a cause of action for disparate impact discrimination under the ADEA. Pursuant to a Stipulation and Order dated March 10, 1997, Cufari discontinued with prejudice his claim for disparate impact discrimination.

ing Cufari's need to improve service with certain customers. After he received his 1991 performance review and until he was terminated Cufari received no further performance evaluations. Additionally, during the several years prior to his termination, Roscoe allegedly made snide remarks to Cufari about the significant amount of vacation time Cufari had accrued (six weeks), as well as Cufari's high salary, resulting from Cufari's lengthy service.

Playfair became Cufari's direct supervisor in March 1993 after Cufari returned from his sick leave. Playfair authored Cufari's December 1993 CAP, but Cufari notes that during his deposition, Playfair was unable to specify any performance problems by Cufari. Additionally, Cufari alleges that Roscoe and Playfair provided conflicting testimony concerning the role of age in the RIF determinations, thus raising a question of fact as to the 'real' reason for the RIF determinations.

Cufari's allegations do not raise a genuine issue of material fact about Xerox's motives. As noted, an employee's subjective view of his own performance is insufficient to create a triable issue of fact regarding pretext. See Viola, 42 F.3d at 718; Shapolia, 992 F.2d at 1039. Similarly, Cufari's subjective opinion about the 'tenor' of his 1990 performance appraisal does not advance his case: he alleges nothing about the 'tenor' which suggests that it is the result of unlawful animus.

Roscoe's alleged remarks about Cufari's accrued vacation time and his high salary are similarly devoid of any express age animus. Cufari's inference that the comments are indicative of unlawful motives is nothing more than that: his own opinion. Cufari offers no evidence whatsoever supporting such conclusion. This is insufficient. Meiri, 759 F.2d at 998 (for a plaintiff to survive summary judgment, he must do more than present "conclusory allegations of discrimination").

Playfair and Roscoe's allegedly conflicting testimony regarding whether age was a factor in the RIF determinations is equally uncompelling. In his deposition, Playfair states that age was considered, inasmuch as Xerox sought to ensure a "mirror image" to "make sure that we weren't disproportionally laying off older and senior people." Playfair Depo. at p. 32. Roscoe testified that age was not a factor. Roscoe Depo. at p. 34–35. In his affidavit submitted in support of Xerox's motion, Playfair states that when preparing Cufari's CAF, he was not instructed to consider and did not take into consideration Cufari's age. Playfair Aff. at ¶ 15.

Cufari alleges that this testimony is inconsistent and that it raises a triable issue regarding pretext. I disagree. As an initial matter I note that while the testimony may appear inconsistent, it is not inconsistent with Xerox's position that age was not a factor, per se, in making individual RIF determinations but that prior to implementation Xerox analyzed and reviewed the RIF procedure and results to ensure that the RIF did not disproportionately impact any protected categories of employees. See Aff. of Anne Mulcahy (sworn to April 11, 1997); Aff. of David Putnam (sworn to April 14, 1997). Thus, I am not convinced that any apparent conflict is, in fact, suggestive of any discrepancy in Xerox's RIF policy.

Even if the testimony were considered conflicting (or confusing), it does not suggest any unlawful age animus. Thus, Cufari still has not met his evidentiary burden. To raise a triable issue about pretext Cufari must proffer **some** evidence that Xerox was motivated by unlawful animus. See Fisher, 114 F.3d at 1339 (" 'a reason cannot be proved to be a "pretext for discrimination" unless it is shown both that the reason was false, and that discrimination was the real reason' ") (citing St. Mary's Honor Ctr., 509 U.S. at 515). At best, this evidence might suggest that there was a lack of clarity about when and whether age was considered, for the purpose of insuring that older employees were not singled out for termination. There is no evidence whatsoever to suggest that Xerox was motivated by unlawful age animus, i.e., for the purpose of singling out older employees. Without more (and in this case there is no more) this testimony is insufficient to raise a triable issue regarding pretext. See Woroski, 31 F.3d at 109 (to defeat summary judgment, plaintiff must show issue of fact concerning whether employer's asserted reason for termination is

false **and** that more likely than not, discrimination was the real reason).

It is significant that Playfair, who took over Cufari's job functions after his termination, is older than Cufari. Playfair's date of birth is July 5, 1938. Cufari's date of birth is September 14, 1940. Roscoe too is older than Cufari. His date of birth is May 24, 1939. Cufari's case is not advanced by the fact that two individuals who prepared his CAF (Playfair) and participated in his stack ranking (Roscoe) for purposes of the RIF are both older than he is.

Additionally, I note that out of the forty-four employees in Cufari's work group, as stack ranked, the top ten individuals were all over forty. Aff. of William Roscoe (sworn to April 14, 1997), Ex. B. indeed, six of those individuals were over fifty. *Id.* This evidence does not suggest that Xerox was attempting to rid itself of older employees.

Similarly, Playfair's testimony regarding Cufari's performance shortcomings does not advance Cufari's case. In his deposition, Playfair stated generally that Cufari needed to make more decisions independently and be more assertive in his staffing decisions, but he was unable to identify specific instances of Cufari's shortcomings in these areas. Playfair Depo. at pp. 26–27. Cufari suggests that this is evidence of pretext for discrimination. I disagree. First, I do not find that Playfair's inability to recall specific instances implies that the general criticisms were insincere. Even if they were, however, there is no evidence to suggest that the real motivator was age animus. Again, it is insufficient for Cufari to raise a triable issue of fact about whether Xerox's stated reasons were the only true reasons for the determination. Cufari must raise a triable issue of fact about age being the primary motive. *See Fisher,* 114 F.3d at 1339; *Woroski,* 31 F.3d at 110. This he has failed to do.[10]

Finally, Cufari suggests that a comment made by Roscoe during a November 1993 meeting between the two men ("maybe they [Xerox] will release me") was in fact really about and directed at Cufari. This inference by Cufari is only that and certainly insufficient raise a triable issue of fact about age motivation.

In short, Cufari has failed to identify any evidence that Xerox's decision to terminate his employment was motivated by unlawful age animus. Cufari's subjective inferences and conclusory allegations are insufficient to create triable issues of fact.

■ Cufari's ADA claim fails as well. In support of this claim, Cufari alleges that during his absence during December 1992 through March 1993, his work assignments were given to others, including John Richmond and James Playfair. He alleges that during this time he was visited at home by John Richmond, who commented that "we don't want to have you running through airports again for awhile." Upon his return, his work assignments were not returned to him in full, and James Playfair (a peer) had become his supervisor. Cufari was not selected to attend a business meeting in California. He felt "emasculated" and that essentially he had been demoted. He was told by a Xerox nurse that Playfair made a "cruel and insensitive" remark about him working part-time. Cufari apparently suggests that these events are evidence of discrimination based upon his heart ailment, and that his ultimate termination was the result thereof.

Cufari's allegations do not suffice to raise a triable issue regarding disability discrimination because there is no evidence that he was disabled, there is no admissible evidence that Xerox perceived him as being disabled, and there is no evidence that there is a link between his termination and his heart surgery.

---

10. Cufari also alleges that a Human Resources employee told him that his low CAF score was based upon unsatisfactory customer reviews. Cufari alleges that because neither Roscoe nor Playfair testified that any customers had been contacted concerning his performance evaluation, this is evidence of pretext. Again I disagree. First, the statement is hearsay and thus cannot be used to defeat summary judgment. *See Burlington Coat Factory,* 769 F.2d at 924. Additionally, Cufari's conclusion is nothing more than a considerable leap of logic and in no way suggests bad faith by Xerox. Again, Cufari has failed to supplement his conclusory allegations with any evidence even *suggesting* unlawful conduct on the part of Xerox.

To establish a prima facie case of discrimination under the ADA, Cufari must show that he is "disabled," otherwise qualified to perform the essential functions of his job, and that he was terminated because of his disability. *See* 42 U.S.C. § 12112(a); *see also Kotlowski v. Eastman Kodak Co.*, 922 F.Supp. 790, 796 (W.D.N.Y.1996). Being "disabled" within the meaning of the ADA means that one (1) has a physical or mental impairment that substantially limits one or more of the major life activities; (2) has a record of such an impairment; or (3) has been regarded as having such an impairment. 42 U.S.C. § 12102(2)(A)–(C).

When determining whether an impairment substantially limits a major life activity three factors are important: the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact of the impairment. *See* 29 C.F.R. § 1630.2(j)(2)(i)–(iii).

Cufari was out on sick leave for roughly four months recovering from major surgery. Upon his return, he worked part-time for four or so weeks, after which he returned to a full-time schedule. There is no evidence that once he recovered from the surgery he was left with an impairment that substantially limited his ability to work. While certainly he was limited in performing life activities for a period of weeks or months, that condition was not permanent. Within six months of his surgery Cufari was working full time and at the time of the RIP (8 months later) he was able to conduct his normal job activities. *See* Cufari Aft. at ¶¶ 35, 37. Cufari did not consider himself to be disabled once he returned to work full time. *Id.* at ¶ 37. Thus, I find that he was not disabled under the ADA.

Nor is there any evidence that Xerox perceived him as disabled. I decline to credit sinister motives to Richmond's entreaty that Cufari should avoid running through airports. Such a comment by a visiting colleague under these circumstances suggests only well-intended concern.[11] Again, Cufari's inference regarding the meaning of facially innocent statements is insufficient to raise any triable issues of fact.

Finally, there is not a single bit of evidence causally linking Cufari's heart surgery and sick leave with his termination. Playfair's alleged "cruel and insensitive" comment about Cufari working part time is not only hearsay and, thus, insufficient to defeat summary judgment, but its substance is unknown. Summary judgment cannot be defeated based upon phantom comments. Cufari's allegations that his termination was related to his heart surgery and sick leave simply will not suffice to sustain his ADA claim. Thus, this claim is dismissed as well.

### N. Salvatore J. Catalano

Plaintiff Salvatore J. Catalano alleges that he was terminated on account of his age, in violation of the ADEA and the New York HRL. Prior to his termination in January 1994 at the age of 49, Catalano was employed as a Quality Control Engineer in Xerox's Components Manufacturing Operations division ("CMO"). In December 1993, Catalano's Manager, Arnold DePietro, completed his CAF, giving him a score of 12 out of a possible 20. He was stack ranked at number 53 out of 157 employees in his department (number 1 being the lowest).

Catalano alleges that his termination was the result of disparate treatment discrimination by Xerox.[12] In support of this claim he asserts the following. Throughout his twenty-one year career with Xerox he consistently received favorable performance reviews and several promotions. In February 1992, while employed in the Sheet Metal "SMF" area of the CMO division, Vele Galovski became Catalano's supervisor. During 1992 Catalano received neither his Interim Performance Appraisal or his "work objectives" as he routinely had in the past. Only at Catalano's

---

11. I note as well that Richmond's date of birth is February 28, 1947. Although not older than Cufari, Richmond was well over forty in 1994.

12. In his complaint Catalano also pled a cause of action for disparate impact discrimination under the ADEA. Pursuant to a Stipulation and Order dated March 10, 1997, Catalano discontinued with prejudice his claim for disparate impact discrimination.

request did he receive from Galovski his annual Performance Appraisal for 1992, and not until March or April 1993. Catalano alleges that this Performance Appraisal was unfairly critical, and he refused to sign it until such time as Galovski revised it (which occurred after Catalano complained to the human resources department).

In November 1992, Catalano allegedly was placed on an "excess employee" list in his department. He was asked by Galovski to seek a position elsewhere at Xerox because the workforce in the SMF area was being reduced. Catalano was told that the request for his departure was due to a "skills mix."

Catalano alleges that while he was pursuing other employment opportunities within the CMO division other individuals under the age of forty were hired into Galovski's department, into jobs that Catalano alleges he was qualified to perform. Specifically, Catalano alleges that his job was filled by one Scott Lippa, who was under 40, at the same time that Catalano was declared "excess."

In January 1993, Catalano sought a position in the Quality Control department of the CMO division, working for Arnold DiPietro. Catalano alleges that DePietro told him that it was in his best interest to leave the CMO organization because "they were 'gunning for me,'" and that Galovski in particular did not want Catalano to get the Quality Control job. Catalano also alleges that DePietro told him that Galovski was trying to "bring in younger individuals into the department." Catalano Aff. at ¶ 13.

Also in January 1993, Catalano alleges that John Pestka, Galovski's supervisor, told Catalano that he (Pestka) wanted to fire "every management person connected with CMO's past" and that no manager in the CMO division wanted Catalano working for him or her. Catalano Aff. ¶ 14.

In October 1993, Catalano was offered a temporary position in DePietro's department, after DePietro received approval to hire him. In January 1994, Catalano was informed that he was selected for the RIF. As in Phillip Cufari's case, *supra*, Catalano alleges that managers responsible for his termination provided conflicting testimony concerning the role of age in the RIF determinations, thus raising an issue of fact as to the 'real' reasons for the RIF determinations.

Catalano's allegations do not raise a genuine issue of material fact regarding his claim of age discrimination. First, any claims based upon actions taken prior to November 1993 are time barred by the 300–day limitation periods of the ADEA. *See* 29 U.S.C. § 626. Catalano filed his EEOC charge of discrimination on or about September 13, 1994. With the exception of the termination itself, all of allegations set forth above involve actions that occurred prior to November 1993. Thus these allegations cannot form the basis for any ADEA claim.

Catalano asserts that he offers these past instances of age discrimination to provide background for his allegations and to establish the history of age animus to which he was exposed. However, I find that none of the alleged events raises a genuine issue of material fact about Xerox's intentions in terminating Catalano. There simply is no admissible, relevant evidence that the alleged actions were motivated by age animus.

As an initial matter, an employee's subjective view of his own performance is insufficient to create a triable issue of fact regarding pretext. *See Viola*, 42 F.3d at 718; *Shapolia*, 992 F.2d at 1039. Also, whether Catalano had been a good employee is beside the point, since he was not fired for cause, but only because of his score compared with his coworkers. *Coleman*, 975 F.Supp. at 247.

Turning to Catalano's specific allegations, there is no evidence whatsoever that the incidents surrounding Catalano's 1992 Performance Appraisal, Interim Performance Appraisal and "work objectives" were age related. The same can be said for Catalano's designation as "excess" in the SMF area. Whatever the reason for these events, Catalano has not produced a shred of evidence that they were age related.

Similarly, alleged statements by DePietro (that CMO was "gunning for Catalano") and Pestka (that he wanted to fire "every management person connected with CMO's past"), if admissible, are devoid of

age-related aspect. These hearsay statements suggest only that Catalano was not a favored employee, but again, there is no evidence whatsoever that the animosity was related to his age. Even DePietro's alleged statement that Galovski was trying to "bring in younger individuals into the department" does not suffice to defeat Xerox's motion. First, it is hearsay. But even surmounting that hurdle, it appears irrelevant. It allegedly was made a full year prior to the RIF, by an individual who had nothing to do with either Catalano's CAF or the decision to include Catalano in the RIF. Galovski Depo. at p. 85; DePietro Depo. at p. 31. Statements made or actions taken by nondecisionmakers, or actions unrelated to the decisionmaking process, cannot be used to support an allegation of pretext. *See Price Waterhouse,* 490 U.S. at 277; *Ayala–Gerena,* 95 F.3d at 97; *McCarthy,* 924 F.2d at 686; *Nawrocki,* 1997 WL 211338 *3.

Catalano's personal observation that at the same time he was declared "excess", Galovski began hiring individuals under the age forty, fails to raise genuine issues of material fact regarding Xerox's intent. Catalano's personal observations and conclusions are just that: they are not supported by any other evidence. Mr. Galovski's deposition testimony shows that the individuals referred to by Catalano were hired into a variety of positions for differing reasons, at differing times, and by different persons. Galovski Depo. at pp. 42–57. They did not all report to Galovski and Galovski did not hire them all. *Id.* Galovski denies that Lippa replaced Catalano. *Id.* at p. 44. There is no suggestion or inference that the various personnel decisions being made by individuals in the SMF area in and around 1992 were even related, let alone sinister. "Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not, in and of itself, prove discrimination." *Futrell,* 38 F.3d at 348; *see also Coleman,* 975 F.Supp. at 242 (replacement by a younger person may be enough to satisfy the fourth element of plaintiff's prima facie case, but it is not enough to create an issue of fact about pretext); *Suttell,* 793 F.Supp. at 74 (mere fact

that younger, less-experienced employee assumed plaintiff's former duties after plaintiff was terminated in RIF was insufficient to give rise to inference of discrimination).

Moreover, these actions took place roughly one year prior the RIF and involved a number of individuals, including Galovski, who apparently had no part in his RIF determination. Galovski Depo. at p. 85 (did not participate in any meetings where impacted employees were stack ranked). As noted, statements made or actions taken by nondecisionmakers, or actions unrelated to the decisionmaking process, cannot be used to support an allegation of pretext. *See Price Waterhouse,* 490 U.S. at 277; *Ayala–Gerena,* 95 F.3d at 97; *McCarthy,* 924 F.2d at 686; *Nawrocki,* 1997 WL 211338 *3.

I note that these were not new Xerox hires, but rather existing Xerox employees who were moved into the SMF area. Such actions generally are not inconsistent with legitimate attempts to cut costs and streamline operations. In short, these allegations alone simply are not sufficient to raise a genuine issue of material fact about Xerox's motives.

Finally, Catalano asserts that managers Pestka and DePietro gave inconsistent deposition testimony regarding the role of age in the RIF determination process. In his deposition DePietro stated that tenure was not a factor (DePietro Depo. at 25) while Pestka testified that tenure was not a factor "at the lower level of evaluations" but that it probably was evaluated by "HR." Pestka Depo. at 44–45.[13] As in Phillip Cufari's case, I do not find this testimony to be inconsistent with Xerox's overall position regarding the RIF determinations, *i.e.,* age was not a factor in making individual RIF determinations but prior to implementation Xerox analyzed and reviewed the RIF procedure and results to ensure that the RIF did not disproportionately impact any protected categories of employees. *See* Aff. of Anne Mulcahy, *supra;* Aff. of David Putnam, *supra.* Thus, I decline to find evidence of pretext in this testimony.

---

**13.** Tenure is not the same as age, although the two often go together. For the limited purpose

of plaintiff's argument on this point only I will consider them synonymous.

In sum, none of Catalano's allegations is sufficient to raise a genuine issue of material fact regarding Xerox's motives.

## N. A. George Dnistrian

■ Plaintiff A. George Dnistrian alleges that he was terminated on account of his age, in violation of the ADEA and the New York HRL. Prior to his termination in January 1994 at the age of 47, Dnistrian was employed as a Curriculum & Document Analyst in the Multinational Customer and Service Education ("MC & SE") division of DPS. In November 1993, Dnistrian's manager Peter DeMauro completed Dnistrian's CAF, giving him a score of 8 out of a possible 20. Dnistrian was stack ranked by other upper level managers. All individuals in his work group who scored an 11 or less were selected for the RIF, with the exception of four individuals—two of whom were 63 and two of whom were 50.

Dnistrian's direct supervisor, Joseph Di-Lallo, determined that Dnistrian "lacked the skills required to advance to a network/system, FACETS, of our deliverables." DiLallo Depo. at p. 37. MC & SE manager DeMauro further testified that Dnistrian did not possess the skills necessary to operate new software and computer based products and would not be able to effectively acquire them., because he "was-very slow." DeMauro Depo. at pp. 32, 35.

Dnistrian alleges that his termination was the result of disparate treatment discrimination by Xerox.[14] As an initial matter, there is an issue regarding whether Dnistrian has met the procedural requirements of the ADEA, because he never filed an administrative charge with either the EEOC or the New York State Division of Human Rights, as required by 29 U.S.C. § 626(d). *See Butts,* 990 F.2d at 1401. Dnistrian contends that this failure does not bar his suit because he should be allowed to "piggyback" on the timely filed charge of the plaintiff George Catalano. *See Tolliver v. Xerox Corp.,* 918 F.2d 1052 (2d Cir.1990).

As in the case of Dominick Maiorano, *supra,* I find it unnecessary to decide this issue. Even if Dnistrian could piggyback on Catalano's administrative complaint, his age discrimination claims are insufficient to withstand Xerox's motion for summary judgment.

Dnistrian asserts in opposition to Xerox's motion that he was harassed for not working overtime even though he completed his work during regular hours; that he requested but was denied the opportunity to have computer training; and that after he was terminated, contract employees under the age 40 were hired to fill his position. Additionally, Dnistrian asserts that a 1995 hiring campaign by DPS is further evidence that the 1994 RIF was motivated by age animus. None of these claims raises a genuine issue of material fact regarding Xerox's motive.

With respect to his claim that he was harassed for not working overtime, Dnistrian provides no evidence whatsoever (except his allegations to the contrary) that this was the result of age animus. The record reveals little about this allegation except that Dnistrian's direct supervisor, Joseph DiLallo, apparently felt Dnistrian was unwilling to work the longer hours that sometimes were demanded. While DiLallo admitted that Dnistrian generally completed his required work in the regular hours, this allegation is devoid completely of any suggestion that the criticism—whether or not well founded—was motivated by unlawful age animus. Without more, such allegation is insufficient to create a genuine issue of material fact about pretext. *Meiri,* 759 F.2d at 998.

Dnistrian's allegation about requesting computer training similarly is flawed. From the record, it appears that Dnistrian identified only two training courses—"Interleaf" and "SunSystems"—which he sought to take but was denied. With respect to Interleaf, he was told the training was unnecessary because it involved systems that Dnistrian did not use. Dnistrian Depo. at p. 19. As for SunSystems, Dnistrian acknowledged that those who were receiving training were working on Sun Workstations, and that he

---

14. In his complaint Dnistrian also pled a cause of action for disparate impact discrimination under the ADEA. Pursuant to a Stipulation and Order dated March 10, 1997, Dnistrian discontinued with prejudice his claim for disparate impact discrimination.

did not have this system. *Id.* at p. 23. Moreover, Dnistrian acknowledged that the individuals who *did* receive Interleaf and SunSytems training were over 40. *Id.* at pp. 20, 25. Finally, the record shows that Dnistrian did receive computer training in other areas in the two years prior to his RIF. *Id.* at pp. 25–26.

In sum, Dnistrian has failed to introduce any evidence that the reason he was denied certain computer training courses was unlawful age animus on the part of Xerox. Without more, this allegation is insufficient to defeat Xerox's motion for summary judgment. *Meiri*, 759 F.2d at 998.

Dnistrian also alleges that after his termination, certain contract employees were hired into his department and assumed his job functions. Dnistrian alleges that these individuals were under 40, and he identified specifically four such individuals: Robert Didas, Tom Harmon, Judy Waldock and Dave Moss. However, Xerox has provided evidence that all of these individuals were, in fact, over 40 at the time they were hired. *See* Aft. Marilyn L. Rogowicz. Even if they weren't however, such replacement hiring by itself is insufficient to establish a genuine issue of material fact regarding pretext. *See Futrell*, 38 F.3d at 348; *Coleman*, 975 F.Supp. at 242; *Suttell*, 793 F.Supp. at 74.

Finally, Dnistrian notes that in 1995 Xerox began a campaign to hire additional "external" employees into its DPS division. This is not evidence of age animus. This hiring campaign began a full year after the 1994 RIF. Nor is there any evidence that Xerox was seeking to hire only individuals under age 40. The notice indicates that DPS was seeking additional staffing due to its need for "additional technical and software skills." *Today at DPS,* internal Xerox memorandum dated February 10, 1995, Ex. B to Clemens Aff dated August 11, 1997. Dnistrian does not allege that he applied for such a position, let alone that he was rejected. This hiring campaign does not raise genuine issues of material fact regarding Xerox's motives during the 1994 RIF.

## SUMMARY

For the reasons stated, each of these cases lacks evidentiary support and must be dismissed. Neither plaintiffs' anecdotal evidence nor their statistical evidence indicates any unlawful discrimination on Xerox's part. In addition to the deficiencies of each individual case, however, it is worth noting that collectively, plaintiffs have alleged what amounts to a massive conspiracy throughout Xerox to fire older workers, but they have produced no evidence to support that claim. Many of these plaintiffs worked in different departments, and the decisions to terminate them were made by different managers. Unless these plaintiffs were all unlucky enough to work in departments whose managers were biased against older employees, the only explanation for this alleged discrimination in so many different departments would be that department managers had been told from on high that they should give preference to younger employees during the RIF process. Plaintiffs, however, have produced not one piece of evidence that such a master plan existed, and in fact some of those plaintiffs who themselves held supervisory positions conceded at their depositions that they had never been instructed to discriminate against older employees. *See, e.g.,* Smith Depo. at 18; Maiorano Depo. at 29.

It is a fact of life in today's economy that companies sometimes downsize. When that happens, some employees, even capable employees with many years of service, are going to be terminated. Their anger at being let go by a company they have served for much of their lives is understandable. The federal anti-discrimination laws, however, were not meant to provide a vehicle simply for venting one's anger, no matter how justified it might be. While plaintiffs may believe that they have been treated unfairly, it would be equally unfair to force a company to go to trial to defend against discrimination claims that have no legally sufficient basis. Plaintiffs have not demonstrated the existence of any genuine issue of material fact about whether Xerox's proffered reason for their terminations is a pretext for any type of discrimination, and accordingly all their claims must be dismissed.

## CONCLUSION

Defendant's motion in *Wado v. Xerox Corp.*, 95–CV–6096L, to exclude the testimony of plaintiffs' expert, Philip A. Smethurst, Ph.D. (Item 21) is denied.

Defendant's motions for summary judgment in *Bernhard v. Xerox Corp.*, 95–CV–6098L (Item 14), *Caruana v. Xerox Corp.*, 95–CV–6099L (Item 14), *Gusciora v. Xerox Corp.*, 95–CV–6100L (Item 20), *Hamann v. Xerox Corp.*, 95–CV–6101L (Item 14), *Hosenfeld v. Xerox Corp.*, 95–CV–6097L (Item 14), *Lalik v. Xerox Corp.*, 95–CV–6331L (Item 17), *Maiorano v. Xerox Corp.*, 95–CV–6130L (Item 15), *Rake v. Xerox Corp.*, 95–CV–6104L (Item 14), *Santiago v. Xerox Corp.*, 95–CV–6103L (Item 14), *Scribner v. Xerox Corp.*, 95–CV–6105L (Item 14), *Smith v. Xerox Corp.*, 95–CV–6106L (Item 15), *Wado v. Xerox Corp.*, 95–CV–6096L (Item 14), *Cufari v. Xerox Corp.*, 95–CV–6176L (Item 12), *Catalano v. Xerox Corp.*, 95–CV–6190 (Item 12), and *Dnistrian v. Xerox Corp.*, 95–CV–6189 (Item 13) are granted, and the complaints are dismissed.

IT IS SO ORDERED.